647 So.2d 918 (1994)
In re the ADOPTION OF BABY E.A.W. G.W.B., Appellant,
v.
J.S.W. and M.F.W., husband and wife, and Stuart R. Manoff, for Attorney ad litem for Baby E.A.W., Appellees.
No. 93-3040.
District Court of Appeal of Florida, Fourth District.
November 30, 1994.
*919 Steven Pesso, Boca Raton, for appellant.
Michele I. Nelson of Paxton, Crow, Bragg, Smith & Keyser, P.A., West Palm Beach, for appellees J.S.W. and M.F.W.
Stuart R. Manoff of Weissman and Manoff, P.A., West Palm Beach, for Atty. ad Litem for appellee Baby E.A.W.
EN BANC
HERSEY, Judge.
The Motion for Rehearing En Banc is granted. The opinion filed in this case on June 22, 1994, is withdrawn and the following opinion is substituted in lieu thereof.
This appeal presents the question whether a baby girl born out-of-wedlock was available for adoption. The legal issue is whether there was an abandonment by the birth father. The validity of the adoption of the baby girl, which we are also called upon to consider, depends upon our resolution of this issue.
After an evidentiary hearing, the trial court determined that there had been no abandonment. Upon rehearing the trial court reversed its decision, found abandonment, *920 and approved the adoption, generating this appeal.
This court, in a three-judge panel two-to-one opinion issued earlier, reversed the trial court's judgment, finding the record evidence insufficient to support a finding of abandonment. Upon motion filed by a party, we agreed to reconsider our position en banc as raising issues of exceptional importance. We now affirm the final judgment, approve the adoption, and certify a question to our supreme court.
As we have indicated, the precise question presented initially to the trial court and now, by appeal, to this court, is whether the baby girl, hereinafter Baby Emily, was available for adoption. If she was, then her subsequent adoption was valid and should be affirmed by our opinion. If she was not, then the adoption must be nullified and this case remanded.
Simplistically stated, the birth father's consent to adoption was required in this case unless the evidence shows that he "abandoned" the child. § 63.072(1), Fla. Stat. (1992). The term "abandoned" is defined in section 63.032(14), Florida Statutes (1992), and provides, inter alia, that "In making this decision, [whether abandonment has occurred] the court may consider the conduct of the father towards the child's mother during her pregnancy."
The trial court made the following findings with which we have taken editorial license in some minor respects for reasons of clarity or materiality or confidentiality:
1. The natural mother, [], and the natural father had been living together for a period of some months when the natural mother became pregnant in November of 1991.
The Court finds that her testimony is unrefuted that she told the natural father of the pregnancy during the Christmas period of 1991. Her testimony at that time was that he had very little reaction to the fact that she was pregnant.
2. During December of 1991 and January 9, 1992, the natural mother was employed and was basically paying her own way. Her testimony was that she received neither financial or emotional support from the natural father during this period of time.
3. She was involved in an accident in January of 1992 and subsequent to that she was not able to work.
4. The natural mother testified that from that point forward she was a lonely and lost person. She received little, if any, financial support from the natural father and she survived on food which was purchased with [her] food stamps and gave her Aid to Dependent Children check to the natural father which basically covered her share of the rent on the unit they lived in. This testimony was substantiated by the testimony of Dr. Parkovich, the natural mother's physician, who testified to the fact that the natural mother looked terrible during this period of time, that their meetings were tearful and emotional and that the natural mother was an emotional wreck and was having substantial problems at home with the natural father. The doctor further testified that the natural mother was not eating properly. Dr. Parkovich testified to substantial money problems and that the natural mother could not believe that the natural father was having an affair during this trying period in her life. Dr. Parkovich also testified that the natural father never came to any of the doctor visits, never drove the natural mother to these visits and it was only because of the natural mother's friends that she was able to attend her visits with her physician.
5. On February 13, 1992, the natural father signed a paper which "required" the natural mother to pay one-half of (in other words, her own) the expenses for rent, electric, water and telephone. Further the document required her to purchase her own food.
6. From February until June of 1992, the parties remained together and the testimony of the natural mother, collaborated by the testimony of her physician, and her neighbor, was that the financial situation between the parties did not change. In other words, the natural mother was, in effect, paying her own way.

*921 7. During this period of time, February to June, 1992, the natural mother's testimony was that there was minimal, if any, emotional support from the natural father. At one point in time, her testimony indicated that there was physical abuse, that he had grabbed her, shook her and had spit at her because she had the audacity to use his razor. The natural mother's testimony was specific that the natural father not only did not supply her with any emotional comfort during this time, but, to the contrary, engaged in name calling and other types of verbal abuse. For example, he told her that she was "worthless" and that every other week she would be threatened with being kicked out of the apartment. The natural mother testified that she was continually fearful of the natural father. Additionally, the natural mother testified that the natural father had a drinking problem which went on continuously during the time the parties spent together.
The natural mother moved out of the natural father's apartment in June of 1992. Sometime prior to this time, the natural mother testified that she had told the natural father she was considering adoption and the natural father's response was "do whatever you have to do."
The natural mother accepted this statement from the natural father as his verbal agreement with her adoption intention. As a result of that, the natural mother continued to follow through with the adoption process. The testimony was specific that at no time from February of 1992 until literally days before the birth of the child, did the natural father in any way either act directly, or by inference, to show any objection to the potential adoption of the unborn child.
Additionally, the testimony of the natural mother revealed that the natural father attended only one visit with any health care provider during the entire course of the pregnancy. While he was there, he was "an ice cube" and showed no emotion of any kind either toward the unborn child or the natural mother herself.
8. From the time the natural mother moved from the apartment through July 9, 1992, she lived with her girlfriend. The testimony of both the natural mother and the girlfriend was that the natural father provided zero financial support during this time and to the best of the girlfriend's recollection there was one telephone call from him to the natural mother during this period of approximately one and a half months.
9. During the period of June, July, and August, when the natural parents were living separate and apart, the natural mother's testimony was that she received neither financial or emotional support from the natural father. The only telephone calls he made to her were at 2:00 or 3:00 o'clock in the morning and were basically made to aggravate her.
10. The natural father's testimony was received initially in a hearing conducted by the Court on October 9, 1992.
The natural father's testimony at that time was that he was earning the approximate amount of $300.00 to $400.00 a week, net, and that he was, in effect, financing all of the food and shelter for the natural mother and her food stamps were basically being used for her son who was also living with them.
11. Contrary to the natural mother's testimony, the natural father testified that he was "overjoyed" with the fact that he was going to be a father.
12. During the entire course of the pregnancy, the natural father's testimony was that he bought the natural mother one pair of stretch pants which the natural mother denied ever receiving.
13. The natural father testified that he bought a crib for $40.00, but the money actually came from his mother and was not money out of the natural father's pocket.
14. The natural father testified that he was contacted by Attorney Charlotte Danciu [the intermediary in the adoption proceedings] in July of 1992 and at that point he was emphatic that he was not going to give up the child for adoption and that he began his quest for legal representation at that time.
15. Additionally, the natural father's testimony was that he did speak with the *922 natural mother on a number of occasions during the month of July and August which statements were denied by the natural mother. This testimony is inconclusive at best, but the more believable testimony, based on the preceding months of these parties' lives, would be that the natural father had very nominal contact with her.
16. The test that the Court needs to follow is whether the testimony presented by the various witnesses establishes by clear and convincing evidence that the natural father did, in fact, financially and/or emotionally abandon the natural mother during the course of the pregnancy. The Court finds that abandonment did occur and, therefore, the Court grants the Petition for Rehearing and by the terms of this order will set aside the previous finding of lack of abandonment.
Specifically, the Court finds that the natural parents' relationship was at best a love-hate situation in its initial stages and deteriorated to the hate side of the scale after the pregnancy and the natural mother's accident. Specifically, even if the Court accepts the natural father's testimony that he was supplying in excess of one-half of the finances of the natural parents, there can be no doubt that he was living off of her food stamps and demanding her Aid to Dependent Children check to supplement the money that he was bringing in as a painter. Emotionally, the testimony is unrefuted that [she] was on her own as far as this pregnancy was concerned. The natural father went so far as to resume a sexual relationship with his former girlfriend at the time that his pregnant girlfriend was suffering from the injuries she received in the accident.
The Court specifically finds that the natural father offered minimal financial support to the natural mother and that the emotional support to the natural mother was nonexistent. More importantly, there was almost no testimony to establish that the natural father exhibited any type of feeling for the unborn child. In fact, it appears that if the prospective adoptive parents' lawyer had not contacted him, he would have continued his passive stance of allowing the natural mother to "do what you have to do." It was only when he was requested to put in writing his acquiescence to the adoption that he changed his position and attempted to assert a legal right. It is interesting to note that he did not rush to the mother's side, offer her any financial assistance, or attempt to become a "prospective father." What he did was rush to the Legal Aid Society of both Broward and Palm Beach Counties in an effort to get a free lawyer to start fighting for some supposed legal right that he had. If this was the man who was earning $300.00 to $400.00 a week net which he claimed he was making and using the money to support the natural mother, how could he possibly have qualified for the advice of the Legal Aid Society. More importantly, it is a simple fact that during the time he was seeking a lawyer, he was still completely out of contact with the natural mother and the unborn infant, both financially and emotionally. Other than attempting to assert his legal rights, that sad fact has never changed.
... .
ORDERED AND ADJUDGED that the evidence is clear and convincing that the natural father did not exhibit sufficient financial or emotional support to the natural mother during the course of the pregnancy to sustain the position that he did not "abandon" either the natural mother or the unborn child. As a result of that abandonment, the Court finds, and, so orders, that it is not necessary for the prospective adoptive parents to secure the consent of the natural father for their continued effort to adopt the minor child.
Additionally, because the Court has found that the natural father abandoned the minor child, it is unnecessary for this Court to delve into the question of the best interest of the child and, therefore, the Court finds that the various objections which were raised to the introduction of certain exhibits and/or testimony would become moot.
The marginal effort of the natural father does not evince a settled purpose to assume all parental responsibilities and the Court, therefore, declares that the child *923 was abandoned (Florida Statute 63.032(14)). Therefore, the prospective adoptive parents are directed to apply to this Court for an appropriate ex parte hearing on the question of the finalization of the adoption.
The trial court did not and we need not distinguish between married and unmarried parents in discussing the issue of abandonment as it applies in this case. Because we conclude with a certified question, however, we suggest that there is a substantial practical and legal difference between the legal status of a birth father married to the birth mother and one who fathers a child out of wedlock. The married father is, from the outset, legally responsible to support the child. The unmarried father has no such automatic legal responsibility. He must take some positive action to assume the responsibilities of parenthood before he becomes entitled to exercise the rights of parenthood. This is only fair. It is also a recognized legal principle. See, e.g., Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). See also, Caban v. Mamen, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979). (We do not overlook the exception created by paternity suits, but that exception has no relevancy here.) It is therefore reasonable and logical to examine the question whether an unmarried father has in fact evinced a settled purpose to assume all parental duties and the corollary that if he "makes only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned." Matter of Adoption of Doe, 543 So.2d 741, 745 (Fla. 1989). The trial court found that to be the situation here.
The final judgment specifically grounded its conclusions upon facts established by clear and convincing evidence. This is the appropriate standard to be applied in a case that terminates parental rights. Kingsley v. Kingsley, 623 So.2d 780 (Fla. 5th DCA 1993). Our standard of review in such a case has been succinctly stated by the First District Court of Appeal in the following language, with which we agree:
We hold that a trial court's determination that evidence is clear and convincing will not be overturned unless it may be said as a matter of law that no one could reasonably find such evidence to be clear and convincing... .
Citing The Florida Bar v. Hooper, 509 So.2d 289 (Fla. 1987). In Interest of D.J.S., 563 So.2d 655 (Fla. 1st DCA 1990). See also Myles v. Department of Health and Rehab. Servs., 590 So.2d 1053 (Fla. 3d DCA 1991).
The dissenting opinions not only question whether there was clear and convincing evidence, but also suggest that one of our precedents for appellate testing of a result required to be based upon a finding of clear and convincing evidence may be flawed. The real problem in this case does not center upon what the father did or did not do. The factual scenario emerges clearly and distinctly. The essential facts in this case were proven clearly and convincingly under any standard. The issue is not so much what he did or did not do: it is rather the legal effect of what he did and did not do. In other words: do the facts constitute abandonment under the statutes and case law. This requires a legal rather than a factual determination, although the entire equation is a mixed question of fact and law, as it so often is.
Additional precepts that guide our evaluation of the final judgment under review require that we "review the evidence contained in the record on appeal in a light most favorable to the appellee, and afford the same consideration to all reasonable inferences to be drawn therefrom as the final order and judgment arrives in this court with a presumption of correctness." Weiss v. Stone, 220 So.2d 403, 406 (Fla. 3d DCA 1969). See also Fawaz v. Florida Polymers, 622 So.2d 492, 495 (Fla. 1st DCA 1993), referencing the indulgence in the "presumption that the appellee, as the prevailing party, is entitled to the benefit of all reasonable inferences that can be drawn from the evidence in a light most favorable to it, ..."
In essence the trial court found that the parties shared living expenses until early June of 1992. During that same period the father verbally and emotionally abused the expectant mother. As a consequence, she *924 moved out and, for the final three months of her pregnancy, there was no financial support, no physical assistance in obtaining medical care, including pre-natal care, or for any of her other daily living requirements (and thus, as well, those of the unborn infant) and any emotional factor contributed by the father was a negative influence. These findings are supported by evidence in this record.
We have previously referred to the case of Matter of the Adoption of Doe, the seminal supreme court case in Florida, to treat the very issues which we confront in Baby Emily. Recapitulating, in our case the parties shared expenses as lovers for a period of time. When cohabitation ended, financial, physical, and emotional involvement by the father ended as well. We modify that observation by recognizing that even before termination of cohabitation the emotional factor was a negative  not support, but abuse. Regardless, the totality of the circumstances here are stronger than Doe in support of a finding of abandonment.
Moreover, in Doe, the natural parents had resolved their doubts and differences and sought to bring their child back into the fold. There was no hint of unfitness of either parent nor of the lack of mutuality of their desire to be reunited with the infant. In contrast, Baby Emily's mother remains convinced that the best interests of the child are better served by approving the adoption. The father has made only legal, after-the-fact gestures toward parenthood. The holding and rationale of Doe support an affirmance here.
The members of this court have struggled with the concept of emotional support as it relates to the issue of pre-birth abandonment. Several of the judges have penned tentative dissents or concurrences based upon the extent to which emotional support of the expectant mother by the birth father is factored into the trial court's and therefore ultimately this court's determination of the issue of abandonment. There is some feeling that emotional support or lack of it may be considered only where there is some indication that it has caused harm to the child. Another faction of judges feel that emotional support is impossible of qualitative or quantitative analysis and thus should not play any part in resolution of the ultimate issue. It is therefore necessary and appropriate that we point out that the trial court's finding of abandonment and our affirmance of that finding is based upon the entire spectrum of "conduct" and is certainly neither limited to nor dependent upon the failure of the birth father to provide emotional support to the expectant mother. Further, the emphasis of the facts in this case is on emotional abuse rather than on a mere paucity of positive support. Were it otherwise, we would be confronted with more difficult evidentiary problems and a more complicated jurisprudential analysis.
Because of the concern of some of the judges, and recognizing that one factor in the trial court's reasoning and thus a partial basis for our affirmance is the issue of emotional support or lack of it, we certify to the supreme court as a question of great public importance the following:
IN MAKING A DETERMINATION OF ABANDONMENT AS DEFINED BY SECTION 63.032(14), FLORIDA STATUTES (SUPP. 1992), MAY A TRIAL COURT PROPERLY CONSIDER LACK OF EMOTIONAL SUPPORT AND/OR EMOTIONAL ABUSE OF THE FATHER TOWARD THE MOTHER DURING PREGNANCY AS A FACTOR IN EVALUATING THE "CONDUCT OF A FATHER TOWARDS THE CHILD DURING THE PREGNANCY."
We affirm the final judgments appealed and remand for such further proceedings as may be appropriate.
AFFIRMED and REMANDED and QUESTION CERTIFIED.
DELL, C.J., and GLICKSTEIN, STONE, POLEN and PARIENTE, JJ., concur.
PARIENTE, J., concurs specially with an opinion, in which GLICKSTEIN and POLEN, JJ., concur.
KLEIN, J., dissents with an opinion, in which FARMER, GUNTHER, WARNER and STEVENSON, JJ., concur.
*925 FARMER, J., dissents with an opinion, in which GUNTHER and STEVENSON, JJ., concur.
STEVENSON, J., dissents with an opinion, in which GUNTHER and FARMER, JJ., concur.
PARIENTE, Judge, concurring specially.

INTRODUCTION
I concur in the majority but write separately to express certain concerns and considerations. This case has become emotionally-charged in part because the child who is the subject of the adoption has now resided continuously with the adoptive parents since September 9, 1992, when the trial court entered an order placing the child in the care of the adoptive parents. It is tempting indeed for us to yield to our own emotions that the best interests of this child will be served at this time by custody continuing with the adoptive parents, especially in light of the biological mother's continued strong desires that her child be adopted into a stable two-parent home. However, we are precluded from considering the reality that bonding between the adoptive parents and child, who is now over two years old, has occurred.
As the supreme court explained in In Matter of Adoption of Doe, 543 So.2d 741, 744 (Fla.), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), the child's best interests, as evidenced by subsequent bonding to the adoptive parents, cannot be a significant consideration where the biological father has acknowledged paternity and asserted his rights shortly after birth:
This must be the rule because, otherwise, a tentative placement or erroneous judgment would be effectively unreviewable and we would have adopted a rule that physical custody, because of subsequent bonding, is determinative in contested adoptions.
The supreme court explained, however, that if the biological father delays for a substantial period of time after the child is in the physical custody of the adoptive parents, the rule would be otherwise:
For instance, there may well be circumstances where a natural father does not acknowledge or declare a parental interest in the child until after the child has been with the adoptive parents for a significant period of time during which substantial bonding has occurred... .
Id.
Thus, at the outset, we are faced with a legal dilemma. We are not to consider the best interests of the child unless the child is legally available for adoption; yet the supreme court has also told us that "[t]he child's well-being is the raison d'etre for determining whether a child has been abandoned by a parent or parents." Id. (emphasis added). We are not to consider the bonding that has taken place between the adoptive parents and the child; yet we know from the testimony in the record in this case that the child may possibly suffer serious psychological damage upon being removed from the only home she has ever known. See also In Matter of Adoption of Doe, 524 So.2d 1037, 1041, (Fla.App. 5th Dist. 1988) quashed on other grounds, Doe, 543 So.2d at 741. This possibility increases the longer the trial and appellate processes drag out, as we weigh the evidence to determine whether it is clear and convincing of pre-birth abandonment by the biological father.
There is another troubling aspect of this case not present in Doe. In Doe, the biological mother and father had married after the birth of the child and acted together in the ensuing litigation to obtain custody of their baby. Here, unlike Doe, from the outset of this litigation, the biological mother has vehemently opposed the biological father's attempts to fight the adoption. She even made her consent to the adoption contingent on a finding of abandonment, which she handwrote into and initialed in the Consent for Adoption:
This consent is given subject to the court finding the birth father['s] ... consent is not necessary. If his consent is to be required I want custody of my child and hereby revoke this consent. [mother's initials]. It would be detrimental to said child to be in [the father's] custody and not in the child's best interest under any circumstances. [mother's initials].
*926 The biological mother made her intention to adopt known to the biological father and took all necessary steps pre-birth and post-birth to effectuate the adoption once it was clear to her that her fantasy of marriage and a "Brady [B]unch type of family" with the biological father would not become a reality. Here we have the potential of a child being returned to a biological mother who has consistently believed during pregnancy, and after the child's birth, that it was in the child's best interests to be adopted.
The protection, however, that our legislature has provided to certain classes of biological fathers, even where an adoption is desired by the biological mother, is to require the biological father's consent, unless the biological father waives his right to consent by abandonment. Therefore, the biological father's consent was a condition precedent to this adoption, unless he abandoned the child. The difficulty we are presented with is in providing a realistic and reasonable interpretation of the term "abandonment" of the child by the biological father within the context of a private adoption which takes place shortly after the birth of the child.

CHAPTER 63 ABANDONMENT DEFINITION
When the supreme court decided Doe in 1989, the word "abandoned" was utilized but not defined in chapter 63, the chapter dealing with private and agency adoptions. It was only defined in chapter 39, entitled "Proceedings related to juveniles," dealing with termination of parental rights. The problem with the statutory definition set forth in subsection 39.01(1), and subsequently engrafted by the legislature into subsection 63.032(14), is that the primary definition clearly envisions circumstances where the parent has abandoned the child post-birth. For example, the first part of the definition states:
"Abandoned" means a situation in which the parent . .. while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. .. .
§ 63.032(14), Fla. Stat. (1993).
Before a child is born, this first portion of the definition has no practical meaning.
The statutory definition further calls on the court to evaluate the efforts on the part of the parent to support and communicate with the child:
If, in the opinion of the court, the efforts of such parent ... to support and communicate with the child are, only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned... .
Id.
Again, this provision contemplates efforts to assume parental duties after the child has been born.
The only portion of the statutory definition contained in the adoption chapter which mentions pre-birth conduct is the last sentence. This is also the only sentence which is not part of the Chapter 39 abandonment definition and was added by the legislature after Doe:
In making this decision [whether the parent has evinced a settled purpose to assume all parental duties], the court may consider the conduct of a father towards the child's mother during her pregnancy.
Id.
Thus, all portions of the statutory definition of abandonment, except for the last sentence, pertain to post-birth efforts to communicate and support the child. Where the adoption takes place within days of the child's birth, the trial court has only the conduct of the biological father towards the biological mother during her pregnancy to evaluate in determining abandonment of the child. Based on Doe, a trial court is permitted to find abandonment of the child based solely on conduct occurring before the birth of the child during the period of pregnancy.

SCOPE OF "CONDUCT"
The crux of the initial legal dispute between the majority and the minority of this court, as expressed in the panel decision, is what type of conduct the trial court has discretion to evaluate. Is "conduct," as used in the statutory definition, an all-inclusive term covering both financial and emotional *927 support, as well as all aspects of the pre-birth relationship between the biological father and biological mother? Must conduct be connected to proof of harm to the child?
Both the majority and the minority of this court agree that evidence of financial support of the biological mother during the pregnancy, or lack thereof, is relevant to making this critical decision. See Doe, 543 So.2d at 746. The Doe opinion rejected the biological father's argument that he had no parental responsibility prior to birth, finding such an argument "legally, morally, and socially indefensible":
Prebirth conduct by an unwed father as it relates to the pregnant mother who needs the support of the father directly impacts upon the welfare of the child. The unwed pregnant mother who is unable to obtain needed support from the father is necessarily forced to take upon herself the entire responsibility for caring for the unborn child and for making necessary plans for the well-being of the child when born... .
Id.
Our views differ on whether the term "conduct," as used in the statute, encompasses more than financial support. We are faced with supreme court precedent in Doe, as well as statutory directive, that pre-birth "conduct" of the biological father toward the biological mother is a factor to consider on abandonment. In this case, as in Doe, pre-birth conduct, by necessity, is the only factor we may consider because of the timing of the adoption.
Conduct certainly encompasses more than financial support and has a meaning distinct from financial support. Generally, conduct connotes behavior. The same dictionary employed by Judge Farmer in his dissent to define support defines "conduct" as, "[t]he way a person acts, especially from the standpoint of morality and ethics." American Heritage Dictionary of the English Language 1804 (3d ed.) (emphasis added).
To allow a trial court to base a finding of abandonment purely on failure to provide financial support in a nine-month period has as great, if not greater, potential for infringing on a biological father's rights to develop a relationship with his unborn child than a finding based on the totality of his conduct towards the biological mother  both emotionally and financially. A hypothetical biological father who provided financial support to the biological mother during her pregnancy, but nothing else, could never be found to have abandoned a child, even though he deserted the biological mother, left all of the decisions concerning the child to the biological mother, failed to render any emotional support to the biological mother, and verbally abused the biological mother throughout the pregnancy.
The supreme court specifically mentioned both financial and emotional support in Doe:
During the critical period, [the biological father] failed to provide [the biological mother] with meaningful emotional or financial support.
543 So.2d at 742-43 (emphasis added).
I do not find evidence, in either the majority's opinion in Doe, or in the subsequent legislative amendments defining abandonment, indicating an intent to restrict the type of pre-birth conduct which may be considered only to financial support:
The weight to be given prebirth conduct will vary from case to case depending on the conduct itself and other circumstances of the particular case, but, in as far as the particular prebirth conduct tends to prove or disprove that the parent has or has not abandoned the child at issue, such evidence is relevant and admissible regardless of the sex or marital status of the parent. Moreover, while the relationship between a parent and child is constitutionally protected, equal protection does not bar rational distinctions between parents. [citation omitted].
Id. at 747.

CONSTITUTIONAL CONSIDERATIONS
In evaluating the competing interests of the biological father's rights, the biological mother's rights and the child's rights,[1] the *928 comments of the supreme court in Doe are instructive:
The intermediary adoption program which the mother selected here is one of the options provided by the state to protect the best interests of the child, the parents and the state. If the biological father retains an absolute veto over the decision of the abandoned pregnant mother to place the child for adoption, the mother's ability to provide for the best interests of the child and herself are nullified. Clearly this is not legislative intent.
543 So.2d at 746.
The United States Supreme Court has interpreted the parent-child relationship as a constitutionally protected liberty interest. However, each Supreme Court case which has considered the extent of the interest, and corresponding constitutional protection of it, has made a clear distinction between the rights of those fathers who have a "mere biological connection" and those fathers who have meaningfully demonstrated a full commitment to the responsibilities of parenthood, assuming an "actual relationship of parental responsibility." Lehr v. Robertson, 463 U.S. 248, 260, 103 S.Ct. 2985, 2992, 77 L.Ed.2d 614, 625 (1983).[2] As stated in Lehr, the "mere existence of a biological link does not merit equivalent constitutional protection." Id. at 261, 99 S.Ct. at 2993, 77 L.Ed.2d at 626.
An unmarried, biological father does not have the same constitutional protection in his inchoate potential parent-child relationship as a biological father whose parent-child relationship has been established and where termination of those established rights are sought.
Parental rights based on the biological relationship are inchoate, it is the assumption of the parental responsibilities which is of constitutional significance.
Doe, 543 So.2d at 748.
This is why, in my opinion, Judge Klein improperly relies on Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), for the measure of this biological father's constitutional rights, by assuming that the biological father in this case has the same constitutional protection as the Santosky father. In Santosky, the biological parents had an established parental relationship with their children prior to the initiation of the neglect proceedings.
By analogy, before a person is deprived of a liberty or property interest, the constitution affords the person due process of law. However, what constitutes due process will vary significantly depending on the nature of the interest. Similarly, before a parental right may be terminated, clear and convincing evidence must be presented. Therefore, while the applicable standard of review is still clear and convincing evidence, the nature of the evidence to be considered varies significantly between those fathers who have "mere biological connections" and those who have developed a parental relationship. The same conduct, which might not be sufficient to terminate a parent's right in an existing parental relationship (no financial support and lack of interest for several months), may be sufficient, as in Doe, to allow termination of an inchoate relationship.
Although the Supreme Court in Lehr considered the rights of a biological father who had the opportunity to develop a relationship with his child but failed to do so, the Florida Supreme Court, in Doe, found those same distinctions applied to allow termination of an inchoate relationship by evaluating the pre-birth conduct of the biological father toward the biological mother, without running afoul of the constitution.

*929 STANDARD OF APPELLATE REVIEW
Our evaluation of the evidence is dependent, not only on how we define and evaluate the significance of the conduct, but on the standard by which we evaluate the evidence. Do we focus on whether there has been a "willful rejection of parental obligations," as does Judge Klein, even though "willful rejection" encompasses only the first part of the statutory definition of abandonment? Or do we focus on evidence of only "marginal efforts [by the biological parent] that do not evince a settled purpose to assume all parental duties," which encompasses the second part of the statutory abandonment definition?
In Doe, the supreme court evaluated the record to determine whether it supported the trial court's conclusions that the biological father's efforts were marginal and did not evince a settled purpose to assume parental duties. The supreme court concluded that "the failure to assume parental responsibility is abandonment and, under Lehr, is sufficient ground to deny parental rights." Doe, 543 So.2d at 749. Thus, I conclude in this case, because we are dealing with an inchoate relationship, the pertinent inquiry is whether the evidence clearly and convincingly established that the biological father's efforts were marginal and did not evince a settled purpose to assume parental responsibility  not whether there is clear and convincing evidence of a willful rejection of parental duties.
The dissenters use the biological father's conduct in Doe as the polestar by which to judge the biological father's actions here. If I were to engage in a "better or worse" comparison, I find the evidence in this case to be stronger than that in Doe of failure to evince a settled purpose to assume parental responsibilities. In Doe, the biological father showed an initial lack of interest in becoming a father, but by the time of birth had entered into a full blown commitment of parenthood and marriage. Here, I cannot disregard the evidence of the biological father's total lack of interest in assuming the responsibilities of parenthood, as well as the evidence of his affirmative misconduct towards the biological mother, emotional abuse and seemingly callous disregard for the pregnant mother's physical and emotional health. By the end of the pregnancy, there was no financial support of the biological mother and no evidence of a settled intent to assume parental responsibilities. While the biological father advised the intermediary that he did not intend to consent to the adoption, the biological father knew of the biological mother's adoption plan and had told her early on to "do whatever [she had] to do."
The testimony in this case also shows the biological father indulged to excess in alcoholic beverages, was abusive and belligerent and would scream filthy names at the biological mother, often ordering her out of the house. Terrified of the biological father, malnourished, distraught and unable to bear the strain, the biological mother moved out. While she tried to avoid the biological father, he sought her out  only to aggravate her, never to help. The effects of the biological father's affirmative misconduct on the biological mother's health during pregnancy was corroborated by her treating physician and friends. Certainly, the trial court could have found this conduct did not evince a settled purpose to assume all, nor indeed any, parental duties.
Interestingly, the dissenters assert that Doe is a more compelling case of abandonment because, according to Judge Klein, in Doe it was "the father's total lack of any interest in becoming a father, from the moment he was told about the pregnancy, which was the clear and convincing evidence of abandonment." Judge Klein transforms evidence of "lack of interest" into proof of "willful rejection" of parenthood.
The dissent fails to mention that in Doe, after first urging abortion because he was not ready to commit to marriage, the biological father, at some period of time prior to the child's birth, urged the natural mother to come to Phoenix, where he was residing, to have the child, live with him and give him time to make the ultimate decision of marriage. When the biological mother advised the biological father that she would not live with him without the benefit of marriage, the biological father asked the biological mother to "at least think about" letting him raise the child. Throughout the pregnancy, the couple continued to communicate. By the time of *930 birth, the biological father's commitment to both biological mother and child solidified.
The dissent makes much of the fact that here, the biological father contributed to the biological mother's support; whereas in Doe, the biological father contributed no support to the biological mother. As pointed out by Judge Hersey, the only reason that any financial support may have been provided in this case arose from the couple living together and sharing expenses as had been the case before the pregnancy. Once the biological mother moved out, due to the biological father's repeated abusive behavior, financial support ceased. The record further reveals that the biological father knew that the biological mother was receiving financial support from the adoptive parents and told the intermediary in July 1992 that he did not intend to contribute to the biological mother's support.
Concerning the trial court's actions in reversing its previous decision, the record reveals that during the second hearing there was additional testimony about the emotional abuse and its effect on the pregnant mother  thereby making it a relevant and important consideration on the issue of abandonment. While sharing Judge Klein's concerns over the trial court's reference in its order to the fact that the biological father sought out a lawyer to assert his rights as indicative of his disregard for his future child, I would point out that the statement was made in the context of the trial court pointing to the biological father's complete failure to make any effort, "ANY minimal effort, to contact the natural mother and attempt to work out any kind of an arrangement other than the adoption that she was proceeding with."
I consider the fact that the biological father accompanied the biological mother to a prenatal appointment where she underwent a sonogram to determine the sex of the baby, that he apparently placed a picture of the sonogram on the refrigerator and may have bought the biological mother a pair of stretch pants during her pregnancy to be superficial manifestations of the desire to be a father, reflecting the biological father's total lack of understanding and appreciation of the magnitude of the parental role. These actions do not constitute any evidence of affirmative assumption of parental responsibilities. If Doe is the benchmark by which we measure abandonment, I disagree with the dissent that the standard was not met. As the supreme court stated in Doe:
[W]e are satisfied that the record supports the trial judge's conclusion that the respondent natural father's efforts were marginal and did not evince a settled purpose to assume parental duties.
543 So.2d at 747.

CONDUCT OF THE ATTORNEY/INTERMEDIARY
A majority of the members of this court is concerned about the conduct of the attorney/intermediary, Charlotte H. Danciu, in these adoption proceedings. Prior to the birth of the baby, Danciu filed papers with the court, including a report of intended placement, dated August 12, 1992, stating: "The birth father['s] consent has been waived by the court." On August 12, 1992, a hearing was held on the adoptive parents' motion to waive the biological father's consent to adoption. On that date, the trial court signed an order waiving the biological father's consent, stating: "The [f]ather ... was advised of the pendency of this hearing by attorney Danciu but has deliberately avoided receiving notice of this hearing by a duly appointed process server." It also recited that: "The father abandoned ... the mother of the unborn child... ." On September 1st, Danciu filed with the court an unclaimed certified mail letter addressed to the biological father, indicating that the last postal notice to the addressee was dated August 13th, which happened to be the day after the order waiving the biological father's consent was signed.
There is no evidence in the record, nor have we been apprised of any evidence, to indicate that the biological father deliberately avoided service of the notice of this hearing by a duly appointed process server. On motion for rehearing, the adoptive parents bring to our attention a notice of hearing that was filed just four days before the scheduled hearing on the motion. This notice is not part of the record submitted to us, but we accept the adoptive parents' contention that *931 it was part of the court file. The notice does not contain a certificate of service; nor does it state whether or how it purportedly was served on the biological father. No motion to waive the biological father's consent appears in the record and there, in fact, is no statutory procedure for a pre-birth hearing on the issue of abandonment.
Here, Danciu knew the biological father was not consenting to the adoption. Nevertheless, she went forward and obtained a pre-birth order finding that the biological father had waived his rights. Danciu did not inform the trial court of her July 1992 telephone conversation with the biological father, in which he told her that he contested the adoption and refused to consent to it. The testimony in the record also indicates that Danciu did not inform the adoptive parents of the biological father's objection and refusal to consent until after the birth of the baby, although on motion for rehearing the adoptive parents contest the implicit conclusion that Danciu did not keep them properly informed. In short, we cannot help but think that candor from this intermediary/attorney to the court and her clients, the adoptive parents, might have prevented the series of events which occurred later.

LEGISLATIVE ALTERNATIVES

RE: PROCESS OF CONSENT AND ABANDONMENT
After this court has labored with this case for over a year, I remain concerned that the present standards for judging the biological father's pre-birth conduct are subjective, uncertain and vague, both for the courts, the biological parents and the prospective adoptive parents. Such standards ultimately create a time-consuming, fact-finding process at the end of which the facts, as determined, still remain subject to varying interpretation and significance.
At the present time, in the case of an adoption which takes place shortly after birth, where the biological mother has consented to the adoption, the trial court is called upon to take evidence on and evaluate a biological father's conduct towards the biological mother over a several month period during the pregnancy. The decision is one which we have urged be made promptly so that the child's status not remain in legal limbo. Yet fact-finding without objective criteria is an inherently time-consuming process requiring the taking of testimony that most likely will be contradictory. In this case, as in Doe, the trial court's fact-finding of the issue of abandonment took place over a period of months, and by the time the issue of abandonment will finally be settled by the appellate process, a period of years will have elapsed.
If the legislature desires a mechanism to assure that unmarried biological fathers act responsibly in the prenatal period, I suggest one possible alternative. The legislature could consider a statutory scheme which might require that the biological mother serve formal notice of her intent to place the child for adoption on the biological father, who then would have a set time to assert his intention to seek custody. The biological father seeking to assert his parental rights would then have to pay a court-ordered amount of pre-birth child support determined by guidelines similar to the child support guidelines. In addition, he might be ordered to attend a pre-birth parenting class and possibly court-ordered counseling. Mediation could be considered where there appeared a reasonable possibility that the biological mother and biological father might reunite as a couple. If the biological father did not comply with the court order, then at the time of birth, the court would have the authority to declare that the biological father had waived his right to consent and the adoption could then proceed.
I offer this suggestion as an example of an alternate method for judging abandonment at the time of birth which would be fairer to the biological mother, the biological father, the child and the adoptive parents. In any revision to the current statutory scheme, the goal should be to render the standards of expected conduct objective, simplify the fact-finding and decision-making process for the courts and expedite the process. As this case demonstrates, expeditious resolution must be a mandate to all courts in any revised scheme.

*932 1994 UNIFORM ADOPTION ACT
Finally, I urge the legislature to look into a more streamlined method of dealing with the issue of parental consent, including consideration of studying the statutory framework set forth in the revised Uniform Adoption Act (1994) drafted by the National Conference of Commissioners on Uniform State Laws. Under the act, unwed biological fathers who know of the biological mother's pregnancy and, upon learning of the pending adoption, attempt to assert paternity rights, but show no significant signs of responsibility toward the child, are not required to consent.
Under this framework, consent is required of an unmarried biological father who has established his paternity and who has "provided, in accordance with his financial means, reasonable and consistent payments for the support of the minor." § 2-401(1)(iii)(A). Consent to an adoption of a minor is not required of "an individual whose parental relationship to a minor has been terminated or determined not to exist." § 2-402(a)(2). There is an elaborate procedure for the time and execution of consents, set forth in sections 2-404 and 2-405, as well as detailed specifications for the content of the consent in section 2-406. Finally, under the act, consent may be set aside by notice to the adoptive parents within 192 hours after the birth of the minor. § 2-408.
Although abandonment is not per se used as a basis for vitiating the consent, there is a detailed section, entitled "Grounds for Terminating Relationship," found in section 3-504 of the 1994 revision. This includes direction to the court to "proceed with the hearing expeditiously." § 3-504(c).
In cases of minors who have not attained six months of age, the factors to consider on termination vary and include directions to the court to consider the respondent's failure to "pay reasonable prenatal, natal and postnatal expenses in accordance with the respondent's financial means" and the respondent's "willingness to assume legal and physical custody of the minor." §§ 3-504(c)(i) and (c)(iv). There is a further subsection which allows for termination of the relationship where the "respondent has been convicted of a crime of violence ... and the facts of the crime or violation and the respondent's behavior indicate that the respondent is unfit to maintain a relationship of parent and child with the minor." § 3-504(3). If this statute were in place, the biological father's prior criminal conduct, which was improperly admitted under our current law in this case, would be a potentially relevant factor on the question of termination.

CONCLUSION
I agree that the scope of the definition of abandonment, and specifically, whether conduct includes emotional support, should be re-addressed by our supreme court as this is a question of exceptional public importance for which the courts are in need of further guidance. I also urge the legislature to reconsider the present statutory scheme of chapter 63, mindful of the tremendous problems presented by situations, like those here, where the unmarried, biological father, simply by withholding his consent, thwarts what the biological mother has concluded throughout her pregnancy is in her best interests and the best interests of the child.
GLICKSTEIN and POLEN, JJ., concur.
KLEIN, Judge, dissenting.
In Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court held that natural parental rights are such a "fundamental liberty interest" under our Constitution that due process would be violated if those rights could be terminated by anything less than clear and convincing evidence. See also In Re Interest of R.W., 495 So.2d 133 (Fla. 1986).
Subsequently, in Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) the Court said in a case involving the rights of an unwed father:
The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility. It is self-evident that they are sufficiently vital to merit constitutional protection in appropriate cases... .
*933 While the Lehr Court said that a mere biological relationship does not warrant the same constitutional protection as an actual parental relationship, it also noted:
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development.
Id. at 254-56, 262, 103 S.Ct. at 2990, 2994.
The Lehr Court was concerned with whether the state of New York had adequately protected the unwed father's opportunity to form a parental relationship. My concern is whether the application of the Florida statute here adequately protects this father's opportunity to form that relationship.
The statute, section 63.032(14), Florida Statutes (1993), defines abandonment as a "situation ... sufficient to evince a willful rejection of parental obligations." Thus, the issue before this court is whether there was clear and convincing evidence of a "willful rejection" by the father of his parental obligations. If the evidence was not clear and convincing, then this father, in being denied the opportunity to develop a relationship with his child, has been denied due process. Santosky.
Our supreme court recently defined "clear and convincing evidence" in Inquiry Concerning a Judge, 645 So.2d 398 (Fla. 1994), as follows:
This intermediate level of proof entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.
[C]lear and convincing evidence requires that the evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the testimony must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue. The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established. (quoting Slomowitz v. Walker, 429 So.2d 797, 800 (Fla. 4th DCA 1983)).
I believe the majority is giving more weight to the trial court's findings of fact than is proper under Inquiry Concerning a Judge. The majority states that a trial court's findings based on clear and convincing evidence should be affirmed, unless "it may be said as a matter of law that no one could reasonably find such evidence to be clear and convincing," relying on In Interest of D.J.S., 563 So.2d 655, 662 (Fla. 1st DCA 1990). The First District made that statement in D.J.S. after observing that there was no case law defining the standard of appellate review of termination proceedings under Chapter 39, Florida Statutes (Supp. 1986). It then applied principles set forth in The Florida Bar v. Hooper, 509 So.2d 289 (Fla. 1987). I believe the First District's reliance on Hooper may have been misplaced.
While the Bar in Hooper was required to prove its accusations against the lawyer by clear and convincing evidence, the supreme court's standard of review in Hooper was governed by Rule 3-7.5(k)(1) of the Rules Regulating The Florida Bar (now renumbered Rule 3-7.6(k)(1)(A)), which provided that the referee's findings of fact "shall enjoy the same presumption of correctness as the judgment of the trier of fact in a civil proceeding." The Hooper court concluded that this rule means that the referee's findings must be sustained if they are supported by competent and substantial evidence. Id. at 291. I believe that the D.J.S. court, in reliance on Hooper, was applying the same standard of appellate review as would be applicable in a preponderance of evidence case.
In Inquiry Concerning a Judge, the supreme court, acknowledging the existence of some evidence before the Judicial Qualifications Commission, nevertheless reversed *934 findings of fact purportedly based on clear and convincing evidence, stating:
Testimony before the Commission on this point is indecisive, confused, and contradictory  a far cry from the level of proof required to establish a fact by clear and convincing evidence ...
645 So.2d at 405. The significance of the above language is that in a case where proof must be clear and convincing, the fact that there is some evidence in the record to support the findings does not mean that the appellate court must affirm. Rather, the evidence must be sufficient to convince the trier of fact "without hesitancy." Id., 645 So.2d at 404.
The method by which an appellate court analyzes evidence in reviewing a judgment based on clear and convincing evidence may well be what is causing this court to be almost evenly divided. I am convinced, however, that the adoptive parents did not sustain their burden of proving, by clear and convincing evidence, that this natural father abandoned his child.
The child was born on August 28, 1992, and the issue of the father's abandonment was fully tried before the court on October 9, 1992. Following the trial, the court entered a judgment on October 16, 1992, emphatically concluding that there was no abandonment:
Based upon the testimony presented, the Court finds that under any definition of abandonment, the natural father has not, in fact, abandoned the natural mother or the child. He has exhibited every available means of attempting to contest the adoption and his desire to have the custody of and to be with his natural daughter was unrefuted during the time of the hearing.
The adoptive parents moved for rehearing, and on January 5, 1993, the trial court granted a rehearing, stating:
While the Court is convinced that its order denying the request that the birth father be deemed to have abandoned the child was appropriate, the Court is concerned with due process in that the prospective adoptive child was not represented at the hearing and as such, may be able to develop factual information which could persuade the Court to reverse the previous decision that this Court made.
After more evidentiary hearings, and almost one year later, the judge completely reversed himself and entered the judgment which is now on appeal.
Since under Inquiry Concerning a Judge, clear and convincing evidence is that sufficient to convince the court "without hesitancy", I find it difficult to understand how this trial judge, after finding no abandonment, could find that there was clear and convincing evidence of abandonment. In explaining his reversal, the court stated in the second judgment:
[T]he Court finds that it, in fact, must reverse its previous decision and find that the natural father did abandon this unborn child. The most important testimony that this Court feels establishes that fact is the previously set forth facts of what the natural father did when the adoption application became a reality to him. It is inconceivable to this Court that the natural father would not have made some effort, ANY minimal effort, to contact the natural mother and attempt to work out any kind of an arrangement other than the adoption that she was proceeding with. He just did not do anything other than run to the State of Florida to attempt to get a free lawyer. He showed not only a callous disregard for the natural mother, he also exhibited a complete lack of understanding or feeling toward the unborn child and the resulting chaos it would cause in the life of the infant after her birth and potential placement with the birth (sic) parents. (Emphasis added.)
It thus appears that the trial court may have reversed its prior decision because the father sought a lawyer. This, however, occurred only a few weeks before the birth of the child, and only after the father was advised by the attorney/intermediary that there were court proceedings. Moreover, the termination of parental rights is such a serious matter that, even though it is not a criminal proceeding, the parents are entitled to counsel under the due process clauses of the United States and Florida Constitutions. In Interest of D.B., 385 So.2d 83 (Fla. 1980). It *935 thus appears that the court was significantly and unfavorably influenced by the father's exercising his constitutional right to counsel.
In Santosky, the court observed that "parents subject to termination proceedings are often poor, uneducated, or members of minority groups" and thus "vulnerable to judgments based on cultural or class bias." This father, I am afraid, may have become a victim of that class bias, as evidenced by the trial judge's criticism of him for attempting to "get a free lawyer."
Nor do I think the fact that the father made no effort to "work out any kind of an arrangement" with the mother, after being notified of the adoption proceedings, would be sufficient to establish abandonment. At that time, about two and one-half months had passed since the mother had moved out, and the relationship had ended. Significantly, the trial court found that "the natural parents' relationship was at best a love-hate situation in its initial stages and deteriorated to the hate side of the scale after the pregnancy and the natural mother's [January automobile] accident."
Although the findings of the trial court set forth in the majority opinion certainly show that the father was sometimes abusive to the mother, I do not think his treatment of her constitutes clear and convincing evidence of a "willful rejection of parental obligations", i.e., abandonment  particularly in light of the fact that the court concluded that the relationship was shaky from the start and that it began to unravel in January, long before the mother moved out in June. Section 63.032(14) says that, in determining whether there has been an abandonment, the court "may consider the conduct of a father towards the child's mother during her pregnancy." While I agree that the emotional conduct of the father towards the mother "may" be "considered" under the statute, I do not think that the father's conduct here is sufficient to constitute an abandonment of parental rights.
In Matter of Adoption of Doe, 543 So.2d 741 (Fla. 1989), it was the father's total lack of any interest in becoming a father, from the moment he was told about the pregnancy, which was the clear and convincing evidence of abandonment. Early on in the pregnancy the father in Doe told the mother to have an abortion because he was not ready to commit to marriage and was troubled by the "whole idea of the pregnancy." Soon after being informed of the pregnancy the father, knowing he would be looking for a new job in January, spent $4,000 to go on a ski vacation over Christmas. Unlike the present case, in which the parties lived together for the first six months of the pregnancy and pooled their finances, the father and mother in Doe did not live together. The father in Doe paid one month's rent for the mother in February, and apparently did nothing of substance beyond that until the time the child was born in mid-September, a period of 6 to 7 months. Although the father was aware that the mother had lost her job and was living on unemployment and charity (receiving her groceries from a church), he did not offer her financial assistance. During the pregnancy the father agreed that the child could be placed for adoption, but took a different position just prior to the birth.[3]
In contrast, in the present case the father testified that he was "overjoyed" and "wanted a baby" when told of the pregnancy. The mother's version was somewhat different, in that she said that the father's reaction was that he "smiled a little". Under either version, however, he did not react as the father in Doe did. Neighbors testified that he brought the sonogram over to show them and was happy about the prospects of becoming a father. With the assistance of his mother he bought a crib which they set up in the house. The mother had a two-year-old child by another man living with them and there was unrefuted testimony from the father that he had a good relationship with her child. As he put it, "I supported Linda for a year and a half and her child, and now I don't want my own?"
The mother decided to leave their home in early June and moved in with a girlfriend. In early July she moved into her own apartment *936 which was paid for by the adoptive parents. The father did not offer her assistance after she moved out; however, she did not request it. It appears from her own testimony that she wanted nothing more to do with him.
When the father received a letter from the adoptive parents' lawyer in July 1992 seeking his consent, he immediately telephoned the attorney/intermediary, "emphatically" told her that he was not giving the child up for adoption, and subsequently sought legal assistance from Legal Aid.
My purpose in setting forth the above evidence is not to demonstrate conflicting evidence, but rather to show that this father's attitude toward the unborn child was entirely different from the attitude of the father in Doe. In Doe, from the time the father knew of the pregnancy he consistently said and acted as though he did not want to be a father. Nor did he give any financial support to the mother for the six to seven months prior to birth.
In the present case the evidentiary basis for the finding of abandonment was not the father's lack of interest in becoming a father. Rather, it was abusive conduct by the father towards the mother, in a situation where the father and mother could no longer stand each other, but apparently continued to live together because they were in dire financial straits. Although this father had far less financial resources than the father in Doe, he nevertheless regularly contributed to the mother's support the entire time they lived together; that is, until she moved out about three months prior to the birth. It is undisputed that the mother did not work following her accident in January. She contributed the food stamps ($203 a month) and the Aid to Dependent Children ($241 a month) which she was receiving. The father paid the rent ($600 a month) and utilities. Although the father did not support the mother after she moved out, she did not seek any support from him, nor seem to want any contact with him whatsoever, probably because she soon began receiving assistance from the adoptive parents.
It thus appears that in Doe the father's parental rights were terminated because he never showed any interest in becoming a father and did not support the mother for six to seven months during her pregnancy, while here the father's parental rights were terminated solely because of his abusive conduct towards the mother during her pregnancy.
At the risk of repetition, I again quote the Lehr Court:
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring.
463 U.S. at 262, 103 S.Ct. at 2994. This father will never have the opportunity to form a relationship with his biological offspring because of his conduct which was directed solely towards the mother at a time when whatever love which had existed in their relationship had turned to hate.
While I do not condone the father's conduct towards the mother, and while I cannot say that the legislature did not intend that emotional conduct be considered by the court, I nevertheless question how trial judges can fairly or consistently decide these cases if emotional conduct is a significant factor. The father's emotional conduct toward the mother cannot be evaluated without considering her emotional conduct towards him. Is he obligated to be emotionally supportive when she wants nothing more to do with him? Should the court consider whether the parents are extremely fragile or overreacting to the strains that a pregnancy puts on a relationship?
The Santosky Court held that the higher burden of proof  clear and convincing evidence  would adequately convey to our trial judges "the level of subjective certainty" about their factual findings which would be necessary to satisfy due process. Id., 455 U.S. at 768-70, 102 S.Ct. at 1403. To me, permitting a court to decide that there is an abandonment based primarily on emotional conduct is inimical to that purpose.
Cases such as this one, in which the mother wants to give up the baby for adoption and the father does not, will not arise where the mother and father have a happy loving relationship. More likely than not the pregnancy will have resulted from a loving relationship *937 gone sour or one in which there was no love in the first place. Under either of those circumstances, it is highly unrealistic to expect emotional support from the father to the mother.
I am well aware that if the best interests of the child were a significant factor in this case, the adoptive parents might well prevail. However, Doe says the best interests of the child are not significant where the father timely objects to the adoption proceeding prior to bonding with the adoptive parents. I am concerned that the trial judge, who initially found no abandonment, could not bring himself to remove the baby from the adoptive parents, when he reconsidered and found abandonment almost one year later.
I am also well aware that the mother is the one who carried and gave birth to this child, and undoubtedly has the best interests of this child in mind. That does not, however, justify violating this natural father's constitutional rights. Because it is a denial of due process to terminate this "fundamental liberty interest" without clear and convincing evidence, and because this evidence did not constitute clear and convincing evidence, as defined in Inquiry Concerning a Judge, I cannot agree that this judgment should be affirmed. I do agree with the majority's certification of the question of great public importance. I also agree with Judge Pariente's comments about the intermediary.
FARMER, GUNTHER, WARNER and STEVENSON, JJ., concur.
FARMER, Judge, dissenting.
I join in the dissenting opinions of Judge Klein and Judge Stevenson. My primary purpose in writing is to express my disagreement with the en banc majority's construction that the terms support and conduct in the abandonment statute properly encompass emotional support of the mother.[4] It is apparent to me that this legislation was borrowed from the Juvenile Justice Code, with the holding in In the Matter of the Adoption of Doe, 543 So.2d 741 (Fla.), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), simply tacked on as an afterthought. As a result of this legislative "cut and paste" the statute is anything but clear and definite.
But even if it were a model of clarity, I simply cannot agree that the legislature could properly make the key question  whether an unmarried father has abandoned his unborn child  turn on anything so subjective, idiosyncratic and elastic as "emotional" support of the mother. By definition we are speaking of relationships outside of marriage, where the parties may not even live together, and they disagree on what to do about her expected child. One such mother, in assessing emotional conduct, may view a father's aloofness during pregnancy as cruel and oppressive, while another mother may view the same conduct in a different man as acceptable reticence. One woman may become distraught and be unable to cope with a man's loud and repeated verbal attacks, while another woman may react to the same conduct as his customary assertiveness. The point is that there is no measuring device for emotional support, no all-purpose standard, no pervasive test. Emotional tolerances change from time to time within the same person and are constantly different from person to person. There is no uniform code of emotional conduct  within or outside marriage. Hence, such a statutory requirement would fail because of its essential confused uncertainty. In any event, contrary to the views of the majority, the term conduct in the last sentence of the abandonment statute can only refer back to the essential term support in the first two sentences. This is so because conduct is a general term that has no meaning outside of specific context. No one would reasonably suggest, e.g., that the legislature could provide that a father could lose his *938 child if he were guilty of "conduct." Such a word must always have a referent in the statute. The essential conduct covered by the abandonment statute is, therefore, not "the entire spectrum of conduct," to use the majority's phrase, but the only kind of conduct that the statute itself refers to, i.e. support.[5]
Statutes concerning adoption are in derogation of the common law and must be strictly construed. In re Miller, 227 So.2d 73 (Fla. 4th DCA 1969); Tsilidis v. Pedakis, 132 So.2d 9 (Fla. 1st DCA 1961). Moreover, as the original panel majority opinion in this case pointed out, the United States Supreme Court and the Florida Supreme Court have jointly established the rule that strict scrutiny is customarily given to statutes affecting the fundamental liberty interest in parenthood. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); cf. Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (constitution does not bar a state from allowing the adoption of 2-year old child without notice to the biological father, where the father had no significant custodial, personal or financial attachment to child); In the Interest of R.W., 495 So.2d 133 (Fla. 1986). At common law the parental obligation of support of the minor child was limited to the necessaries of life. In re L.G.T., 216 So.2d 54 (Fla. 4th DCA 1968). And even though at common law the father of a child born outside of wedlock had no rights as to the child, in Florida the courts have recognized that the father of such a child had a preferential right to custody of his natural child. In re Guardianship of D.A. McW., 460 So.2d 368 (Fla. 1984) (strong public policy in favor of unmarried natural father having custody of child); cf. State ex rel. Sparks v. Reeves, 97 So.2d 18 (Fla. 1957) (biological parent has natural God-given right to custody of child; rule is older than common law). Moreover, under the adoption statutes before the term abandonment was ever added or defined, the failure of a natural parent to support the child, while relevant, was insufficient itself to justify an adoption of the child over the parent's objection. Solomon v. McLucas, 382 So.2d 339 (Fla. 2d DCA), rev. denied, 389 So.2d 1112 (Fla. 1980).
When a word commonly has both a primary or strong sense, and at the same time also has a different weak or tertiary sense, and the legislature does not expressly state which sense it intends, the usage not being clear in its context, then the statute is at the very least ambiguous. Under strict construction, the definition of the term abandonment must then be construed in favor of the father. It cannot be construed to reach possible secondary meanings that increase the burden on the father to maintain his right to his child. Those who contend in this case that the father abandoned his child by conduct in failing to give emotional support to the mother before birth can succeed only by engaging in a liberal construction of the terms, thereby extending the ordinary meaning of support and conduct to include the possible, additional, weaker meanings. But this is precisely what they are not permitted to do under the rules of strict construction and scrutiny.
Judge Klein has emphasized that the relevant inquiry is whether the father has been clearly and convincingly shown to have abandoned his parental duties, i.e., his duties toward the unborn child. The issue is not whether he was a good cohabitational partner with the mother during her pregnancy. Indeed the only reason that prebirth conduct should ever be considered is to shed light on whether he sought to abandon his incipient duties as a father. The fact that prebirth conduct of the father may be admissible at all, however, cannot become transformed into a rationalization to evaluate how good he was *939 as a helpmate to the mother before the child was born.
But even if the statutory terms could be construed to allow the court to consider emotional nonsupport or abuse as some evidence on the abandonment issue, in my opinion the evidence adduced by appellees on rehearing in the trial court simply did not rise to the level of the clear and convincing standard. Indeed if one aggregates all of the evidence adduced by the adoptive parents and intermediary at both the original hearing as well as the rehearing, excluding the irrelevant evidence about the father's past, and casts it in a light most favorable to appellees, it doesn't amount to proof of anything approaching abandonment. It shows two people living together outside of marriage who had simply become unable to stand one another.
The fact that he did not drive her to medical appointments during pregnancy has no logical capacity at all to prove or disprove whether he intended to assume his parental duties toward the child. The fact that he spat at her in the heat of argument, or that he called her late at night to yell at her, has no logical capacity at all to prove or disprove whether he intended to assume his parental duties toward the child. The fact that he insisted that she pay her share of their joint living expenses has no logical capacity at all to prove or disprove whether he intended to assume his parental duties toward the child. The fact that she decided to move out of their house and give up the baby for adoption and live off the adopting parents has no logical capacity at all to prove or disprove whether he intended to assume his parental duties toward the child. The fact that he was an "ice cube" emotionally during a joint visit to one of her doctors has no logical capacity at all to prove or disprove whether he intended to assume his parental duties toward the child. The fact that she availed herself of prenatal medical services under the Medicaid program, for which together they qualified, and that he then did not pay anything towards her medical expenses, has no logical capacity at all to prove or disprove whether he intended to assume his parental duties toward the child. If this were a chapter 39 proceeding for termination of parental rights, would any judge seriously entertain these facts for moment as tending to show that the father had abandoned a child even before the child was born?
When something affecting a constitutionally protected right[6] must be proved with clear and convincing evidence, I do not believe it is possible to carry the day with facts that are susceptible to differing inferences, one probative and the other not. Evidence is not clear and convincing when it is consistent with both sides view of the case. When the inferences are vague, when the motives are murky, when the conduct is capable of being understood under different interpretations, the evidence cannot possibly fit the definition of the clear and convincing standard shown by Judge Klein.
I do not think that this statutory text is capable of being construed as allowing pre-birth conduct to show an intention of a father to abandon a child not yet born by anything other than the most definite, unmistakable and undeniable of acts. I think it requires nothing less than the father saying in the most positive terms or doing something impossible of misunderstanding that he has no intention of ever supporting his child. I do not believe that abandonment of an unborn child can be found by mere inference from conduct that is consistent with other less drastic meanings, or that it can be proven by anything short of the father saying so in the most unmistakable of words. Certainly, there is nothing in Doe or the statute itself that suggests a contrary meaning.
There is still another aspect of the clear and convincing standard, which everyone concedes governs this case, that should be *940 stated. After the first hearing the trial judge unequivocally decided from the evidence that by any standard the father had not abandoned his child. Then after a rehearing, the same judge later decided upon essentially the same evidence that the same conduct by the same father amounted to clear and convincing evidence of abandonment. The original panel assigned to this appeal decided by a 2-1 vote that the evidence failed to meet the clear and convincing standard. Now the entire court of appeal has reviewed the case; and of 11 regularly serving judges, only 6 have decided that the evidence does meet the clear and convincing standard. No one has yet explained how evidence could be deemed legally clear and convincing unless every judge who reviewed it agreed that it was. Thus, if that many judges are so closely divided over whether the evidence is clear and convincing, that alone should be sufficient to demonstrate irrefutably that the evidence is anything but "of sufficient weight to produce a firm belief or conviction without hesitancy."
I believe so strongly that the evidence in this case fails to show abandonment by the required clear and convincing standard that I have decided (for it discusses the evidence in detail) to attach the original panel majority opinion, In re the Adoption of Baby E.A.W., 19 Fla. L. Weekly D1336 (Fla. 4th DCA June 22, 1994), as an appendix to this dissent.[7] In my opinion it is not possible to fairly read the transcripts of the various hearings and reasonably conclude that the evidence is so weighty and substantial that it produces a firm conviction of anything, and certainly no conclusion comes without considerable hesitancy. The sheer multiplicity of widely varying opinions among the 12 judges (counting the trial judge) who have considered this matter is the strongest possible confirmation I can think of to demonstrate the inadequacy of the proof here to hit the clear and convincing mark.
I join the majority, however, in certifying the question to the supreme court.[8] The subject of this statute is one of those areas of primary human conduct dealing with fundamental decisions affecting the family unit. Because of the importance of the adoption laws in this state and the confusing structure and lack of clarity in the abandonment provision, I believe that the supreme court should have the ultimate say in this case. Until the meaning of this statute is made absolutely clear, so that birth parents and prospective adopting parties will know precisely what is *941 expected of them, the unhappy circumstances of this case will only reoccur.[9]
GUNTHER and STEVENSON, JJ., concur.

APPENDIX

(Opinion filed June 22, 1994)
FARMER, Judge.
This case began by presenting a single issue of admittedly great consequence  namely, whether a birth father had waived the right to consent to the adoption of his child by reason of his conduct during the pregnancy. Unhappily, it has since become needlessly complicated with multiple irrelevant issues and thereby unreasonably delayed, all to the detriment of the child. In the end, nearly one year after originally deciding the waiver issue in favor of the father, the trial judge  confronted by a welter of heated contentions  reversed his ruling and, after hearing much evidence on issues that had no bearing on the waiver question, concluded that the father had forfeited the right to object to the child's adoption. The father now appeals, raising multiple issues. We are compelled to reverse.
We begin with the relevant evidence, which is very much in conflict.[1] The birth mother and father, Linda and Gary, had been living together without marriage for some eight months when she became pregnant in November 1991. She told him of the pregnancy one month later, at Christmas. She had been working as a waitress, while he was employed as a painter. He earned $300-400 net weekly; her income is unknown. She was in an automobile accident in January 1992 and ceased working thereafter.
At that time, Linda had a 2-year old child by another man living with her and Gary.[2] She hoped that she and Gary would be married and that they would have a "Brady Bunch kind of family life." Their financial arrangements, meanwhile, were that they would divide equally the monthly household bills consisting of rent ($600), electricity ($50-70), water ($25), and phone ($60). Each agreed to pay for her/his own food. Hence, without counting food, their base joint monthly living expenses for necessaries were more than $700.
In February 1992, out of work because of her accident, she applied for welfare benefits (AFDC) and food stamps. To assist her application, Gary signed papers reciting the above financial arrangements. It is not clear when she began receiving public assistance, i.e. April or May 1992, but she ultimately began to receive monthly AFDC checks in the sum of $241, out of which she gave him $200 toward her share of household expenses. She also received monthly food stamps of $203, which she used to buy food for herself and her custodial child.
Hence, for the first six months of her pregnancy, he contributed more than half of their expenses, and thus regularly and continuously supported her in helping to maintain the household in which she resided. A brother of Gary, who had lived with Gary and Linda for a short time at the beginning of her pregnancy, testified that her financial contributions to the household were "a joke." Their joint arrangement lasted until she voluntarily left the household on June 3rd.
During this period of joint residency, she never asked him to help her find health care; nor did he do anything to obtain medical care for her pregnancy. Along with welfare benefits, however, she received Medicaid prenatal care. There is no evidence in the record to show that either Gary or Linda were covered by any health insurance plan or that either or both together were in fact financially able to bear the costs themselves of prenatal health care services. Indeed, the only conclusion *942 that the evidence will bear is that, at their combined income level with her pregnant, together they qualified for Medicaid.[3] Hence, he was not financially able to have provided her with prenatal health or medical care. From the very beginning, Medicaid was thus the only possible source of necessary obstetrical services.
Linda described Gary's reaction to the news of her pregnancy as: "He smiled a little and basically that was it." She also testified that he was cold to her during her pregnancy and offered no emotional support. Several witnesses testified that Gary drank alcoholic beverages frequently, was often drunk, and verbally abused her when he had been drinking. When she first broached the subject of adoption with him, she described his response as: "Do whatever you have to do." At another point, when asked to illustrate how he had abused her, she recounted an incident in which he spat at her after she had used his razor. At other times he would call her names and tell her to "get out."
A chiropractor treating Linda for her automobile accident injuries testified that Linda was always crying and very depressed. She complained to the chiropractor that Gary was offering her no emotional support. That was also the substance of testimony given by several of her friends.
From the time Linda began getting health care services for her pregnancy, she looked to other people for transportation to and from her providers. Gary did nothing to assist her in that regard. On the other hand, he worked during the day, and she usually saw her treating health care professionals during ordinary business hours. The evidence does not reveal whether she ever asked him to take her, although one of her friends testified that on occasion he would be home when the friend provided transportation for Linda. She testified that later, after they separated, he did accompany her for a sonogram.
Gary's version was decidedly different. He described his reaction to the news that Linda was pregnant as "pretty happy, honestly overjoyed as a matter of fact. It was my first child. I was excited, wanted it, wanted a baby." He acknowledged her growing unhappiness throughout her pregnancy, but explained that he accepted his mother's advice that this was normal in pregnancy. He testified that he accompanied Linda for a sonogram on June 18th and that he posted the sonogram on his refrigerator. At one point he said ironically: "I supported Linda for a year and a half and her child, and now I don't want my own?"
Furthermore, neighbors who had socialized with both testified that they observed the pair as being very loving during the time when Linda resided with Gary and that Gary brought the sonogram over to show them and was happy about impending fatherhood. His mother had even assisted him in his impending fatherhood by buying a crib which they set up in their house.
On June 3, 1992, without being compelled by him to do so, she decided to leave the house. At first she moved in with a girlfriend, but left that temporary housing on July 9th and moved into her own apartment, paid for through the prospective adoptive parents. Although she did not tell him where she was actually staying, she gave him a telephone number where she could be reached. Linda said that he called her several times over the ensuing three months, sometimes in the late night hours, trying to harass her, but he did not try to visit her. In fact, Linda testified that after he received notice of the adoption proceedings from the intermediary, Gary did attempt to contact her in what she described as one of his late night harassing telephone calls. Gary testified that she also called him after she had moved out.
*943 Gary did not inquire as to her medical care after she moved out, and he did not offer her any assistance during the three months before she delivered. On the other hand, neither did she ask him for any help in that regard. In fact, at the first hearing, she testified that after she moved out, she tried to avoid him. She had acquired an automobile by then and now drove herself to her providers. It was during this period that he accompanied her for the sonogram.
It is undisputed that when he received a letter from counsel for petitioners in July 1992 seeking his consent to the adoption, he telephoned the attorney/intermediary and "told her emphatically that I had no  there was no way that I was going to give this child up for adoption no matter what Linda has been telling her, there was no way." He added that he immediately sought legal assistance from Legal Aid, and was ultimately referred to his present attorney, because "I want my daughter." The attorney for petitioners testified that, in response to a notice she had sent Gary, he called her some two weeks before the actual birth and refused to consent to the adoption. She added:
"I said this is what you need to do and he said, oh, and they are going to pay all her fees and who's helping me or something like that. I don't know. He said, I'm not paying for nothing and he hung up on me, as a matter of fact."
At the end of July 1992, the attorney/intermediary, Charlotte H. Danciu, filed a pre-birth petition for approval of expenses for an adoption of Linda's baby, listing the expenses that the prospective adoptive parents had agreed to pay for Linda. These expenses included $625 for monthly rent and utilities, and $240 for food.[4a] The judge signed an order authorizing payment of these expenses.
Danciu, as intermediary, also filed other necessary papers, including a report of intended placement, dated August 12, 1992, stating: "The birth father['s] consent has been waived by the court." On August 12th, the judge also signed an order waiving Gary's consent, stating: "The father was advised of the pendency of this hearing by attorney Danciu but has deliberately avoided receiving notice of this hearing by a duly appointed process server." It also recited that: "The father abandoned the mother of the unborn child." On September 1st, the intermediary filed with the court an unclaimed certified mail letter addressed to Gary indicating that the last postal notice to the addressee was dated August 13th, which happened to be the day after the order waiving Gary's consent was signed.[5a]
Danciu, as attorney/intermediary, also failed to inform the court of her telephone conversation with Gary, near the middle of August, in which he told the attorney that he contested the adoption and refused to consent to it.[6a] We are just as appalled to learn that there is later testimony of the prospective adoptive parents that the attorney likewise failed to inform them of Gary's objection and refusal to consent until after the birth of the baby.[7a] We cannot help but think that a little candor from this intermediary might have prevented some of what occurred later.
E.A.W. was born without complication on August 28, 1992. On September 3rd, Gary served a motion to set aside the ex parte order waiving his consent. In sworn testimony, he said that after his mid-August conversation *944 with the intermediary he sought legal assistance to contest the adoption even before the baby was born. He contacted Legal Aid offices in both Broward and Palm Beach Counties. His efforts to obtain legal representation were delayed by Hurricane Andrew, as the Broward County office was closed for a week. Nevertheless, the evidence is unrefuted that he sought to assert his rights even before his child was born.
On September 8th, the prospective adoptive parents [petitioners], through the attorney/intermediary, filed a petition for the adoption of Baby E.A.W. The petition contained a statement that the birth father's consent was waived by the August 12th order, but made no mention of either the intermediary's mid-August telephone conversation with Gary or his September 3rd motion to set aside the order of waiver. The petition was also accompanied by an HRS form with background information signed by Linda clearly identifying Gary as the father of the child. On September 18th, the court entered an order setting aside its August 12th order waiving the father's consent. The court promptly scheduled an evidentiary hearing on the issue whether Gary's consent should be deemed waived by his conduct.
After hearing substantially all of the above evidence at a hearing on October 9th, the trial judge entered an order one week later, on October 16, 1992, on petitioners' motion to waive the birth father's consent. The judge concluded from the evidence that "under any definition of abandonment, the natural father has not abandoned the natural mother or the child." The court thereupon denied the motion to waive the birth father's consent. On the very next day, Gary filed a petition for habeas corpus seeking custody of his child.
Within 10 days after the entry of the waiver order, however, petitioners moved for a rehearing on the abandonment issue. On November 3rd, counsel for petitioners in her capacity as the "Intermediary" filed a motion  which the court promptly granted  calling for the appointment of an attorney ad litem for the child.[8a] On December 8th the attorney ad litem filed a motion in the name of the child for a rehearing of the waiver/abandonment issue, praying for a new hearing on the issue.
On January 5, 1993, the trial court entered an order granting rehearing, saying as follows:
"While the Court is convinced that its order denying the request that the birth father be deemed to have abandoned the child was appropriate, the Court is concerned with due process in that the prospective adoptive child was not represented at the hearing and as such, may be able to develop factual information which could persuade the Court to reverse the previous decision that this Court made. Therefore, with reluctance, this Court grants the motion for rehearing as was filed by the prospective adoptive child through the child's attorney * * *."
The order then set February 11th for a de novo evidentiary hearing "on the question of the alleged abandonment by the birth father of the prospective adoptive child."
The rehearing began on February 11th but ended without hearing from all the witnesses whom the attorney ad litem intended to call. All of the evidence relating to the issue of abandonment presented at the rehearing by the petitioners and the attorney ad litem was in substance a rehash of the evidence that had been first presented at the October 9, 1992, hearing. To be sure, new witnesses testified. But, except for the intermediary, none of them gave additional evidence regarding the abandonment issue. The repeat witnesses (who had already testified at the first hearing) merely restated their previous testimony without offering any significant new facts.
On the other hand, much of the evidence received actually related only to the "best *945 interests of the child" and consisted of extensive facts surrounding the father's conviction in Minnesota in 1977 for burglary and sexual battery. Included also was evidence about a 1985 arrest for sexual battery which resulted in an acquittal. It is fair to say that this criminal conviction and the later criminal charges, along with many collateral features, became the very focus of the rehearing.[9a] The February 11th hearing ended with the court stating that it would set a date for a resumption of the rehearing testimony.
The rehearing finally resumed on August 3rd, and all the remaining additional evidence was received then. On September 20th, the court entered an order on rehearing essentially reversing its October 16, 1992, order (which had found no abandonment and no waiver), and instead found an abandonment and thus a waiver.[10] Explaining that the issue was whether there was clear and convincing evidence to establish that the father had abandoned the mother "financially and/or emotionally" during her pregnancy, the trial court based its turnabout on three essential grounds:
(1) the father failed to support the mother financially during her pregnancy and allowed her to become a public charge by having Medicaid pay for her prenatal care;
(2) the father failed to support the mother emotionally during her pregnancy; and
(3) instead of consenting to the adoption, the father sought the assistance of Legal Aid to assert his parental rights, which had the effect of creating chaos in the life of E.A.W.
The father timely filed his notice of appeal, and we have expedited these proceedings.[11]
We first pause to comment on the amount of time elapsing between the first presentation of the waiver issue and the final decision on that subject. What we say on this subject is not meant to be a criticism of the trial judge in this case, but is instead intended to be advisory to the trial judges who hear these cases. Clearly a judge sitting in equity has the authority to change the judicial mind after a final judgment and order a trial de novo. See Hollywood Inc. v. Clark, 153 Fla. 501, 15 So.2d 175, 180 (1943). We think it may be improvident, however, to take months or more to do so in a contested adoption of a newborn infant.
*946 The strong interest of the child in having a stable family during the critical formative period of life argues with great force against the kind of judicial delays that may be appropriate in ordinary civil litigation. If a court is to rehear discrete issues in an adoption case, and the waiver issue is among the most critical, the rehearing should usually take place as soon as practicable and ahead of almost any other pending matter. Delays of months should be tolerated only when no possible consequence of delay can affect any interest of the child. Trial and appellate judges should be ever vigilant to press these cases to finality with alacrity, and should simply not allow the parties by inaction or stipulation to delay the matter.
Before we decide the legal sufficiency of the trial court's grounds for concluding that the father had abandoned the mother during pregnancy, we must first discuss In the Matter of the Adoption of Doe, 543 So.2d 741 (Fla. 1989), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989) [Doe]. There the court decided the certified question whether generally an unmarried father's failure to assume support responsibilities and medical expenses for an unmarried mother who requires such assistance, and he is aware of her needs, is a basis for a trial court to excuse his consent to the adoption of his child on the grounds of abandonment.
In answering in the affirmative, the court paused to acknowledge the general validity of the fifth district's holding in that case "that the best interest of the child is not a relevant factor unless the child was legally available to be adopted."[12] 543 So.2d at 744. The court approved that statement, but with a qualification: when the birth father has delayed in making his interest in custody known and the child's situation has changed during the period of the father's delay, then the best interests of the child may be relevant to the waiver issue. As the court explained:
"For instance, there may well be circumstances where a natural father does not acknowledge or declare a parental interest in the child until after the child has been with the adoptive parents for a significant period of time during which substantial bonding has occurred. In such a case bonding would be a material consideration on the issue of abandonment."
543 So.2d at 744.
Clearly that is not the case here. This father acknowledged and declared his parental interest in the child before she was even born. Indeed the attorney for the petitioners admitted that she had spoken to the father at least two weeks before the birth of the child and that the father had refused to consent to the adoption and stated his interest in raising the child. It is thus clear that the supreme court's qualification on the irrelevancy of best interests evidence at the waiver hearing has no application here. Evidence relating to the best interests of E.A.W. was thus inadmissible on the issue whether this father had abandoned the mother during pregnancy.
This is really not a new holding, as that rule has long been applied in this state and by this court. In In re the Adoption of M.A.H., 411 So.2d 1380 (Fla. 4th DCA 1982), where the issue of abandonment was vigorously contested, we observed that the adoption law before 1973 did not require the child to be abandoned for the child to be adoptable. Although the legislative change requiring that the child be abandoned in order to be available for adoption was "hard to accept" in the opinion of Judge Letts, and the best interests of the child not yet relevant, we nevertheless decided that abandonment was indispensable to a court considering adoption and the best interests of the child. See also In re the Matter of Adoption of Noble, 349 So.2d 1215 (Fla. 4th DCA 1977); and In re the Adoption of J.C.E., 487 So.2d 1117 (Fla. 4th DCA 1986). In two widely publicized recent cases in other states, the same principle was applied. In re Petition of John Doe and Jane Doe, 159 Ill.2d 347, 202 Ill.Dec. 535, 638 N.E.2d 181 (1994); and In the Interest of B.G.C., 496 N.W.2d 239 (Ia. 1993).
We thus restate what has simply been the law in this state for a considerable amount of time and cannot be seen as new or revolutionary. *947 The best interests of the child, except in the limited circumstance described in Doe, is not relevant to the threshold issue whether the birth father has waived his right to consent to the adoption by prebirth abandonment of the mother. Nor is this principle at odds with the legislative intent set forth in section 63.022(2)(l), Florida Statutes (1993), that "[i]n all matters coming before the court pursuant to this act, the court shall enter such orders as it deems necessary and suitable to promote the best interests of the person to be adopted." Earlier in the same statute, in subsection 63.022(2)(a) to be exact, the legislature has articulated, as its very first purpose in the listing of its intentions under the adoption statutes, thus: "The child is legally free for adoption."
Giving section 63.022(2)(l) its literal and, we think, obvious meaning, therefore, there is no question of best interests to be considered because until there is a "person to be adopted" there is yet no specific child capable of being given to adoptive parents. Waiver must necessarily be first determined because, unless both birth parents consent to the adoption or their consent has been excused by reason of abandonment, the adoption proceedings are at an end.
Moreover, from a relevancy standpoint, waiver evidence is concerned with the past conduct of the parents; it is thus retrospectively concerned about parental history. In contrast, while it may include past conduct of the people whose claims are at issue, best interest evidence is concerned exclusively with the future of the child. When the question is solely whether a father has waived his right to consent to adoption by his conduct during pregnancy, it is irrelevant to consider evidence that tends to prove with whom, among the contenders, it will be in the best interests of the child to be placed for adoption.
We now analyze the facts in Doe and those in this case. As regards the answer to the certified question in Doe, the court's discussion of the operative facts begins by noting that the father refused marriage and urged the mother to have an abortion. Although he and the mother saw each other regularly, when she lost her job and went on welfare he offered her no support at any time. In fact the trial court found that he initially agreed to adoption when she suggested it. The trial court had also found that when the father learned that the mother was pregnant, just before a planned ski vacation at Christmas break in December, he had already accumulated savings of $10,000 during that month on a job that was just ending.
Even though he knew he had to find a new job and that she was pregnant, he nevertheless went on the ski holiday with the mother and spent $4,000 of his savings on that vacation alone. He did however pay one month's rent for the mother in February after their holiday and allowed her to use some furniture and a microwave oven. Aside from that single month's rent and the use of these goods, he made no contribution out of his remaining $6,000 toward her support during her pregnancy. In her seventh month, she moved to Florida where her mother began arranging an adoption. She remained in contact with him and told him of the adoption plans. He now did not want an adoption but still refused marriage and offered no help. It was only after the child was born and given to the prospective adoptive parents that he finally came forward to object to adoption, proposed marriage and acknowledged paternity. 543 So.2d at 742-743.
The court ruled that this conduct by the father during pregnancy "tend[ed] to prove or disprove material facts bearing on abandonment and may be properly introduced and used as a basis for finding abandonment under the statute." 543 So.2d at 746. The court explained:
"* * * the issue of abandonment turns on the question of whether the parent has evinced a settled purpose to assume parental duties. Providing prebirth support to the unborn child is a parental duty. Evidence of whether the parent has or has not furnished customary support to the pregnant mother is relevant to the issue of abandonment. In answer to the certified question we hold that an unwed father's prebirth conduct in providing or failing to provide support responsibilities and medical expenses for the natural mother is relevant to the issue of abandonment under *948 section 63.072(1). We caution that this analysis cuts both ways. In circumstances other than those here, an unwed father would be justifiably entitled to argue that his conduct in providing prebirth support to his unborn child was relevant to his claimed right to refuse consent to the adoption of his child."
543 So.2d at 746. The court went on to state that it was "satisfied that the record supports the trial judge's conclusion that the [father's] efforts were marginal and did not evince a settled purpose to assume parental duties." 543 So.2d at 747.
We contrast the facts here with those in Doe. This birth father never suggested abortion, and the mother even admitted that he was happy when she told him that she was pregnant. Whether he impliedly acceded to an adoption early on is equivocal at best: "Do what you have to do." Most importantly, he furnished more than half of the costs for housing for himself and the mother jointly, as well as for her 2-year old child, for at least a period of 6 months during her pregnancy. He stopped furnishing such support only because she decided to move out.
The evidence shows without contradiction that he regularly and continuously contributed to her support during the six months that they lived together. And there is no evidence in this record that Gary had the financial resources that the father in Doe enjoyed, or was able to furnish more than he did. Also in Doe, the father's income would not have made father and mother living together eligible for Medicaid benefits, while here father and mother together were eligible for Medicaid. Unlike the mother in Doe who asked the father for help, Linda said that she had tried to avoid Gary after she moved out. Finally, Gary had made his objection to the adoption known well before the birth and placement of E.A.W. with the petitioners, while the father in Doe was urging other solutions right up until the child was born.
In 1992, the Florida legislature codified the decision of the supreme court in Doe as to the certified question. See Ch. 92-96, § 3, Laws of Fla. With that change, section 63.032(14) now defines abandonment as follows:
"(14) `Abandoned' means a situation in which the parent or legal custodian of a child, while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If, in the opinion of the court, the efforts of such parent or legal custodian to support and communicate with the child are only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. In making this decision, the court may consider the conduct of a father towards the child's mother during her pregnancy."
§ 63.032(14), Fla. Stat. (1993).[13]
We turn to a consideration of the three grounds on which the trial court essentially based its decision on rehearing. As to the first ground of financial abandonment, the adoptive parents and attorney ad litem primarily base their contention on the fact that Gary failed to pay, or offer to pay, any of Linda's prenatal medical expenses and that Linda had to resort to public welfare and Medicaid. They specifically point to Justice Shaw's opinion in Doe, where he speaks of fathers who transfer their own burden of support to society at large. 543 So.2d at 749.
But his comments cannot be read in isolation and must be understood in the context of the facts in Doe, where a father squandered $4,000 on a ski vacation and failed to use any part of his $6,000 in savings (not to mention what he was capable of earning) to support the mother. Thus, the father in Doe was deemed to have abandoned the pregnant mother by allowing her to rely solely on welfare benefits when, all the while, the father *949 had assets from which he could have supported her.
Here, there are no such comparable facts. To the contrary, neither this father or mother ever had the resources to pay for Linda's prenatal care. Mother and baby were destined from the very moment of conception to receive their medical care out of public funds. To charge this father with abandonment because both mother and father could not afford prenatal care is to charge him for being poor.
The critical statutory text for this case is "while being able" in the definition of "abandoned." When a father's income is such that the father and mother living together as a family unit are eligible for Medicaid to pay necessary obstetrical expenses, it cannot be said that the father "while being able" has abandoned the mother financially or has lived off of her during her pregnancy, when he merely "acquiesces" in the mother's acceptance of Medicaid benefits for prenatal care.[14] The presence of those words in the statutory definition of abandonment prevents fathers who are incapable of paying for health care from being accused of abandoning their parental duties. As we have already observed, with Gary and Linda's combined income they qualified as a family unit for Medicaid pregnancy benefits. There was no reasonable basis to charge Gary with failing to pay for all or part of her prenatal medical costs, when the governmental standards establish that persons with Gary and Linda's joint income required Medicaid assistance in order to assure adequate prenatal care. Here, the proponent of abandonment, the petitioners, failed to show that Gary had the ability with his income level to furnish the necessary level of obstetrical care. Hence, the first ground for the trial court's change of mind is legally insufficient.[15]
The second ground for finding an abandonment on rehearing is equally insufficient. The focus of both the trial court and appellees is on whether he supported her emotionally. To rely on a father's lack of emotional support for the mother during pregnancy, without any showing that the lack of emotional support so harmed the mother that the child she was carrying suffered direct physical injury, is entirely too vague a standard on which to base a finding of abandonment. Even assuming that the legislature could leave this important ingredient to judicial definition on a case by case basis, there would still have to be some statutory standards as to precisely what emotional support is required. Without a textual foundation in the statute, we are unable to infer abandonment from the mere failure of a father to give prenatal emotional support to the mother.
Moreover, even if there were a statutory element of emotional support, it would necessarily apply to all parents, married or unmarried, divorcing or divorced. That is true because there is nothing in the statute itself to suggest that such a requirement applies only to unmarried fathers. Indeed it is the very application of the abandonment law to *950 married parents, as well as the unmarried, that saves the statute from unconstitutionally denying equal protection. Doe, 543 So.2d at 747. We cannot help but note that applying to married fathers the requirement of emotional support to the mother during pregnancy yields very curious results: e.g. one might then colorably contend that divorcing parents forfeit the right to custody of minor children because they stop supporting each other emotionally during a pregnancy. Hence, the statute simply will not bear the construction that an unmarried father is required to provide emotional aid and comfort to the mother during pregnancy in order to avoid a finding of abandonment.
The statutory definition speaks of "support," not of love and caring.[16] We understand the statutory text, "makes no provision for the child's support" and "conduct of the father toward the mother during her pregnancy," to relate to the mother's material needs of shelter, food, and medical or prenatal care affecting her physical well being.[17] Our statutory analysis begins with the fundamental interest that a birth parent has in the custody, fellowship and companionship of the parent's children. In re Guardianship of D.A.McW., 460 So.2d 368 (Fla. 1984) (strong public policy in favor of natural parent having custody of child); State ex rel. Sparks v. Reeves, 97 So.2d 18 (Fla. 1957) (biological parent has natural God-given right to custody of child; rule is older than common law). The United States Supreme Court and the Florida Supreme Court have jointly established the rule that strict scrutiny is customarily given to statutes affecting the fundamental liberty interest in parenthood. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); cf. Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (constitution does not bar a state from allowing the adoption of 2-year old child without notice to the biological father, where the father had no significant custodial, personal or financial attachment to child); In re the Interest of R.W., 495 So.2d 133 (Fla. 1986). Consequently, we find the second ground for the judge's change of decision also legally insufficient.
Last, we address what seems to have most affected the trial judge  the fact that the father sought help from Legal Aid to assert his parental rights. Access to legal services is not only a constitutionally protected right but, as the father's resort to Legal Aid demonstrates, we have now created statutory rights to publicly funded legal services.[18] It *951 should also come as no surprise that anyone whose income places them below the federal poverty level qualifies for such assistance. Hence if we are to castigate eligible parents for seeking legal aid, we might just as well blame them for seeking welfare benefits or Medicaid for which they have qualified under the applicable statutes and regulations.
Of course, this simply cannot be an attainder, any more than poverty itself can be understood as evidence of one's lack of legal worth. No one should be made to suffer some legal impediment for exercising an entitlement to Legal Aid, any more than one should suffer for exercising the underlying right to be vindicated by such legal services. To draw an adverse conclusion from asserting the legal rights of a birth father, i.e. to infer harm to the child from the very assertion of the father's claim to the child, is to damn the parental right.
Florida has long recognized that a parent is entitled to counsel when the state seeks to terminate parental rights. See In the Interest of D.B., 385 So.2d 83 (Fla. 1980); see also § 39.465(1)(a), Fla. Stat. (1993). Can we logically leap from that recognition to penalizing a father simply for seeking legal aid to contest whether he should be deemed to have abandoned his unborn child during pregnancy? It would be strange legal reasoning to provide counsel in the one circumstance but punish the use of legal services in the other. It would also be entirely antithetical to the basic right of a birth parent to the society and custody of a child. We thus find this last ground legally insufficient for the court's abandonment decision.
Among the most difficult cases encountered by judges are those concerning the contested adoption of a minor child. No matter what path judges choose in these cases, the effects on the child's life will be profound. Even with the brightest of auguries in the form of uncontradicted evidence, the future may be markedly different than envisioned and, in any event, not the same if another decision had been made. In short, even when everything has been done with scrupulous exactitude throughout the adoption proceedings, the best interests of the child are simply unknowable, and confidence that the best has been chosen is unattainable. It is primarily for that reason that we have laws to govern judges in adoptions, and not their hearts or emotions. Our decision today should be so understood.
The question of custody of E.A.W. is not before the court on this appeal. It is unfortunately true that the persons a child gets as parental custodians have a profound effect on the development of that child. In the great scheme of things, many children might benefit from having adoptive parents instead of their birth parents. And so while much of the evidence below might call into question the ability of either this father or this mother to be the best parent for E.A.W., that is of no interest to the law until the nondependent child is available for adoption, through either a waiver/abandonment or a termination of parental rights.
We decide cases on the legal issues presented to us, as we are required to do within the system of justice that governs disputes between our citizens. Our code of laws, rather than the primal feelings of human judges, is the source of our strength as the world's oldest democracy. The right of birth parents to the society and custody of their children is an ancient right of civilized people and among the most prized. Florida's statutory laws recognizing and enforcing these interests of birth parents are too well established to be ignored. That explains what we have been compelled to do today.
We therefore reverse the order finding that the birth father has waived his right to consent to the adoption and the final judgment of adoption. On remand, the court shall also set aside the mother's consent, which was itself conditioned on the father's consent being obtained, and conduct further proceedings consistent with this opinion.
REVERSED AND REMANDED WITH DIRECTIONS.
WARNER, J., concurs.
HERSEY, J., dissents with opinion.
HERSEY, Judge, dissenting.
Because I see the facts and some aspects of the applicable law in a slightly different *952 light than the majority in this reasonably close case, I must respectfully dissent.
The major issue is whether the baby girl E.A.W. was available for adoption. That, in turn, depends upon whether the father abandoned the expectant mother and thus the child. The statute, section 63.032(14), Florida Statutes (1993), provides as follows:
(14) "Abandoned" means a situation in which the parent or legal custodian of a child, while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If, in the opinion of the court, the efforts of such parent or legal custodian to support and communicate with the child are only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. In making this decision, the court may consider the conduct of a father towards the child's mother during her pregnancy.

(Emphasis supplied.)
The question, then, is whether the evidence clearly and convincingly supports a finding that the father's conduct constituted only a marginal effort that does not evince a settled purpose to assume all parental duties. It is interesting that the legislature has now specifically provided that the court may consider the conduct of a father towards the child's mother during pregnancy. As the supreme court once held, "[w]here the legislature's intention is clearly discernible, the court's duty is to declare it as it finds it, and it may not modify it or shade it, out of any consideration of policy or regard for untoward consequences." McDonald v. Roland, 65 So.2d 12, 14 (Fla. 1953). Contrary to the suggestion of the majority that no textual foundation exists in the statute, use of the word "conduct" suggests to me that more than financial support is intended. The term is broad enough to, and certainly should, extend to physical assistance in attending to prenatal needs of the mother (such as doctor's appointments) and even to emotional support of the mother which may well affect the well-being of the fetus and its appropriate development.
Turning, then, to the factual issues, it is true that the father permitted the mother to live in his household for a period of time. I do not believe that the exact percentage of the mother's expenses that were incidentally paid by this arrangement is nearly as important as the lawyers at trial and the majority opinion seem to think. If it were crucial, however, then it should be pointed out that: while she was pregnant but before her accident she was a waitress and contributed her earnings to household expenses; during December the father did not work at all and apparently she supported the household; for a short period of time the father's brother lived in the household thus increasing expenses; and, the mother eventually contributed $200 of her $241 welfare check, plus $200 of her $203 food stamp money to the household. She was not self-supporting but contributed what she had. Two observations follow from that. These parties cohabited for several months before she became pregnant. His contributions to her support had little or nothing to do with assuming parental duties nor do they evidence an intention to do so. On the other hand, continuing the live-in financial arrangement or failing to terminate it upon learning of the pregnancy may be said to be some evidence that the father did not intend to abandon the mother and child. A second observation: the mother moved out on June 3rd. After that date the father apparently continued to bring home $360 to $400 per week to support a household of one. He was hardly destitute. The evidence shows that except for a two-week period the father always knew where the mother was. Yet he never paid or offered to pay one penny toward the support of the expectant mother after that date. He never took her or offered to take her to a doctor's appointment or anywhere else. He, in fact, refused to pay anything toward the costs of childbirth. He never once inquired about her health or the well-being of his child.
The natural father, unable to show any substantial and continuing financial or physical or emotional support to the expectant mother and fetus, or later, the child, points to *953 three incidents as evidence of his dedication to parenthood. Far from showing a settled purpose to assume all parental duties, these demonstrably inaccurate assertions simply lend further support to what has become the dominant theme of this case. The natural father has made only temporary and minimal and happenstance contributions to the expectant mother. After she moved out, even that ceased. The only evidence of an intention to be a parent to this child was the naked assertion of the legal right. That cannot be enough in the eyes of the law, in light of statutory requirements and judicial precedent.
The examples offered by the father of his attempts to fulfill his role as an expectant parent are that he bought the mother a pair of stretch pants and a baby crib and accompanied her to have a sonogram. There is testimony and therefore the trial court could have found that the father did not buy either the stretch pants or the crib. The fact that there is a picture of a crib in evidence says nothing about who bought it. The testimony shows that he did not.
The father claims to have attended two sonogram sessions. The mother testifies he attended only one, and only because she insisted and picked him up and drove him to the session. If that speaks to the issue of a settled intention, it is no more than a whisper.
Turning, next, to the mother's "voluntary" act of moving out of the household on June 3, 1992: how is that to be explained and what effect does it have on the father's support obligation (a father's obligation to support his child)? The testimony shows that the father indulged in alcoholic beverages to excess; that he would become abusive and belligerent; that he would scream filthy names at her and very often would order her out of the house. For a time she clung to her fantasy of marriage and a "Brady bunch type of family." His constant verbal abuse eroded that dream little by little.
The mother was malnourished and distraught, according to testimony in the record. Ultimately she was unable to bear the strain and moved out. She was terrified of him and tried to avoid him, but he sought her out. Thus he knew where she was at all times, but contacted her only to aggravate, never to help.
On the relevant evidence presented, the trial court could have found that the conduct of this father toward this expectant mother does not evince a settled purpose to assume all parental duties, nor indeed any "parental" duties.
This raises the question, given the clear and convincing evidence standard, how the trial court could find no abandonment and later, on similar relevant evidence, find just the opposite. One can only speculate since we are not privy to the thought processes of the judge. A possible explanation is that in the first hearing the focus was on the intention or purpose of the father as evidenced by what he said. He wanted his daughter. He said so. While some of his statements may have been equivocal, on balance it could be said, measured by his stated intention, that there was no intent to abandon his unborn child. During and after the second hearing the trial court may have focused on what the father did: that is, his conduct towards the child's mother during her pregnancy. Weighed on that scale the court could have found, regardless of the father's later stated intention to keep his daughter, that his actions toward the expectant mother, and as well his non-action, constituted clear and convincing evidence of abandonment.
The majority opinion analyzes the trial court's order on rehearing and characterizes the result as resting upon three premises, each of which is then found to be legally insufficient. Without quibbling as to whether there are or are not only three discrete aspects of the trial court's reasoning, I disagree with the majority's position on each of the three mentioned.
Before coming to grips with those areas of major disagreement, I would preliminarily note a minor one. The opinion makes reference to the father's reaction to learning of the mother's pregnancy and suggests that "the mother even admitted that he was happy when she told him that she was pregnant." As I read the record the mother did not recall the father having any reaction to *954 this news. He may have smiled. I do not understand this as evidence of an admission by the mother that the father was happy about her pregnancy.
The first basis for the trial court's determination of abandonment is said to be the trial court's acceptance of the contention of the adoptive parents and the attorney ad litem that the father failed to pay or offer to pay any of the prenatal medical expenses. By so limiting the issue, it is then a simple matter to conclude that because he could not afford to pay for such services this is not a legally sufficient reason to support a finding of abandonment. I believe the majority opinion restricts the trial court's intention too narrowly. The trial court's view encompassed all aspects of support, not simply prenatal medical care. The father lives alone, has no dependents and brings home $350 to $400 per week. At no time after June 3rd did the father pay or offer to pay one penny toward the support of the expectant mother. Not one item did he purchase for her or the child. If this is not a legally significant factor to be taken into account by the fact-finder, then it is difficult to imagine what would be. Granted the suggested conclusion, standing alone, might not be sufficient; it seems to me that it is clearly legally significant.
The majority opinion indicates that the second basis for the result reached by the trial court is the failure of the father to provide emotional support to the expectant mother. In my view this assertion too narrowly construes the sense of the language of the order before us. As indicated earlier, the trial court is empowered by statute to consider the "conduct" of the father toward the mother. While it is clear this expectant mother suffered emotional starvation at the hands of this father, there was much more to his conduct than emotional deprivation. It is true that the order stresses the emotional aspect, but the trial court also found that, according to the natural mother's testimony,
"there was physical abuse, that he had grabbed her, shook her and had spit at her because she had the audacity to use his razor. The natural mother's testimony was specific that [the natural father] not only did not supply her with any emotional comfort during this time, but, to the contrary, engaged in name calling and other types of verbal abuse. For example, he told her that she was "worthless" and that every other week she would be threatened with being kicked out of the apartment. The natural mother testified that she was continually fearful of the natural father. Additionally, the natural mother testified that the natural father had a drinking problem which went on continuously during the time the parties spent together.
The natural mother moved out of the natural father's apartment in June of 1992. Sometime prior to this time, the natural mother testified that she had told the natural father she was considering adoption and the natural father's response was "do whatever you have to do."
The natural mother accepted this statement from the natural father as his verbal agreement with her adoption intention. As a result of that, the natural mother continued to follow through with the adoption process. The testimony was specific that at no time from February of 1992 until literally days before the birth of the child, did the natural father in any way either act directly, or by inference, to show any objection to the potential adoption of the unborn child.
Additionally, the testimony of the natural mother revealed that the natural father attended only one visit with any health care provider during the entire course of the pregnancy. While he was there, he was "an ice cube" and showed no emotion of any kind either toward the unborn child or the natural mother herself."
The majority opinion suggests, as indicated earlier, that emotional support or lack of it is not an appropriate element of "conduct" to be considered by the trial court in these situations. I am inclined to disagree. When the legislature used the word conduct in the statute I believe that it was intended to include any act or omission, whether financial, physical or emotional, that impacts upon the well-being of the expectant mother and thus ultimately upon the fetus itself. In my view these factors should all be considered in determining whether "the efforts of such parent *955 ... are only marginal efforts that do not evince a settled purpose to assume all parental duties... ."
Where parties are in the process of obtaining a divorce during the pregnancy, or where other variations on the preferred theme of a harmonious relationship between father and expectant mother exist, the trial court will need to consider the effect of such special circumstances on the presence or absence of emotional support, but the same thing may be said of physical and financial support. The required analysis may tax the discretion of the court, but to say that it is difficult does not excuse the exercise. I therefore disagree with the majority opinion that evidence of emotional support or lack of it does not enter into the equation. Even if it did, however, the trial court did not rely on lack of emotional support alone to support the final decision.
Finally, the majority addresses "what seems to have most affected the trial judge  the fact that the father sought help from Legal Aid to assert his parental rights." The opinion goes on to suggest at length that the trial court is castigating the father for being poor and for seeking free legal assistance. If this interpretation were correct, I could not disagree with the opinion. In my view, however, it is not a correct reading of the trial court's order. What the trial court is attempting to convey in this part of the order is that instead of lifting one finger to help the expectant mother, the father was interested only in asserting his own legal rights. He did not go to her or call her or write to her with the first offer of physical, emotional or financial support. His action at this juncture was, as it had been throughout the pregnancy, of not one thought, word, deed or dollar for the mother and child, but he would nonetheless claim his rights as the natural father. The trial court was expressing frustration with the contradiction in terms which the conduct of the father thus creates. It would appear that he was justified in doing so.
Of course the majority concludes that this ground, as interpreted by its opinion, is "legally insufficient for the court's abandonment decision." I suggest that the interpretation is incorrect and that the conclusion is therefore flawed.
In summary, the majority opinion characterizes the underpinnings of the order being reviewed as having three prongs, each of which is said to be legally insufficient to support a finding of abandonment. I interpret the trial court's order differently and find, in sum, a legally sufficient basis for a finding of abandonment. In this court the father, as protagonist, has the burden to show there is no evidence to support the trial court's finding of abandonment. As I interpret the record the father fails to carry that burden here.
Having concluded that the trial court has fallen into error the majority opinion, in reversing, also instructs the trial court to "set aside the mother's consent, which was itself conditioned on the father's consent being obtained." It seems to me this is unwarranted at this stage, since no party has argued for or even requested that relief.
The majority opinion states that there was no basis for the trial court to appoint an attorney ad litem for the newborn child in these adoption proceedings. I tend to disagree.
Section 63.022(2)(l), Florida Statutes (1993), provides:
(2)(l) In all matters coming before the court pursuant to this act, the court shall enter such orders as it deems necessary and suitable to promote and protect the best interests of the person to be adopted.
As pointed out by the majority, a minor's consent to his own adoption is not required unless the minor is more than twelve years of age. The minor himself therefore has no interest to protect as a party to the proceedings. Again, in Doe, the Florida Supreme Court holds that bonding, as an aspect of best interests of the child, is an appropriate issue only where the nonconsenting parent caused the delay which made the bonding between child and adoptive parents possible. That is not to say, however, that other interests of the child not related to the age of consent or bonding can never become an issue in a proceeding to establish abandonment. The raison d'etre for adoption is best *956 interests of the child and society. The legislature says "in all matters" related to an adoption the trial court may enter appropriate orders to promote and protect the best interests of the person to be adopted. What the legislature giveth, this court taketh away. I think we should not, and that is one of the reasons for my dissent.
Turning again to the consequences of what we do in this case, there are other considerations that have prompted my dissatisfaction with the result reached by the majority. One problem arises from an infirmity in the structure of the adoption process. By the stroke of a pen we have severed the relationship between baby girl E.A.W. and her adoptive parents, the only mother and father she has ever known and with whom she has lived for the first two years of her life. We do so to protect the "natural God-given legal right" of a birth parent "to enjoy the custody, fellowship and companionship of his offspring." State ex rel Sparks v. Reeves, 97 So.2d 18 (Fla. 1957). We do so in light of abundant precedent stressing the sanctity of biological parenthood. But, we do so here without any assurance that she will be returned to the loving arms of a parent. We more likely send her back to await a custody battle which may cause her to be placed in temporary foster care for another period of time, and ultimately, perhaps, to be offered for adoption again.
This is not mere speculation. The mother believes to this day that adoption is in the best interests of baby girl E.A.W. She consented to the adoption. She supported the position of the adoptive parents throughout the trial court proceedings and she continues to do so on appeal. Only if the adoption is reversed with custody reverting to the father does she seek to resume her parental role.
What of the father, then, and his quest for custody of baby girl E.A.W. As I interpret the majority opinion, his fitness as a parent is not an appropriate issue in the adoption proceedings, either at the trial court level or on appeal. That issue awaits consideration in subsequent custody proceedings. Whether appropriate or not, the record gives us a glimpse of testimony that has been and would presumably again be introduced on the issue of his fitness for custody. In due course, assuming it surfaces again in the custody hearing, that evidence will be tested for credibility and materiality. It is too late for this case, but there should be a mechanism to resolve the issue of parental fitness within the context of adoption proceedings when that issue is raised. And it should be raised. Otherwise we have, as here, a vicious circle.
One final observation. The proceedings below and activities ancillary to those proceedings were far from ideal. Nevertheless, I found nothing appalling in anything done by counsel except that they collectively, and I am sure unwittingly, allowed the proceedings to drag out for a year or more. I agree with the majority opinion that we should not criticize the trial judge for the excessive delays. There is nothing in this record that supports attributing those delays to him. Had he the wisdom of Solomon he might have correctly decided this case at the first hearing and ended it. But who is to say which result is correct. The future of a baby girl was at stake. There were areas of doubt. There were protagonists. He did his best in the face of all that. My dissent concludes that the final result was correct, which would mean that the delays did not unduly and adversely impact upon the life and future of baby girl E.A.W. As it turns out, the majority opinion goes the other way in this close case. For that reason, the delays loom ominously upon the relationships of the parties.
I respectfully dissent.
STEVENSON, Judge, dissenting.
I join in the dissenting opinions written by Judge Farmer and Judge Klein.
I write only to register my observation that the termination of parental rights is an extremely serious matter and concerns not only the rights of the parents but also the fundamental constitutional rights of the child to receive the love, companionship and society of its natural parents. For the most part, unless the natural parents are abusive or otherwise unfit, children learn to love them for who they are and to respect them for their worth as individuals. Unfortunately, *957 often what the natural parent has to offer pales in comparison with what someone else might offer, but still the natural child finds whatever pearls may lie within the oyster shell of the natural parents. The severing of the parent-child relationship based on anything short of neglect and abuse, at a time when the child is unable to meaningfully participate in the decision or even render its opinion about the matter, must be approached with utmost caution.
Truly, we must admit that here, we do not know what outcome Baby Emily would most want in this predicament. Would it be sufficient to her, ten or fifteen years from now, to know that a relationship with her natural father was denied to her because of evidence of abandonment that was at best contradictory and ambiguous? Would it comfort her to know that the trial judge on one day said in no uncertain terms that clearly her father did not abandon her and on the next occasion, considering virtually identical testimony, concluded that the evidence was clear and convincing that he had abandoned her? Would it be sufficient to explain to her that no court decided that her father was unfit, unable, or unwilling to care for her, but that it was found that her father "abandoned" her based on events occurring during a brief three or four month period, albeit an important one, when the father did little to comfort the mother emotionally (although both mother and father had reached a stage in their relationship where neither could tolerate the presence of the other) and hardly anything at all financially (although the mother voluntarily left the home she shared with the father, the father knew that the mother was in no acute physical distress, and knew that the mother was receiving the same level of prenatal care that she would have received had she continued residing with him)?
Within the context of human experience in the real world, the evidence in this case that the father has "abandoned" his child is far from clear and convincing. As Justice McDonald remarked in his dissenting opinion in Matter of Adoption of Doe, 543 So.2d 741, 751 (Fla. 1989):
[H]istory has demonstrated that, unless unfit, the best interest of the child lies with the natural parents. It is but a matter of time before this child will learn of his adoption and wonder why. All that can be said to him is that, even though your [father] wanted you, the adoptive parents and the courts would not let [him] have you because ... he did not treat your mother as well as he might have when she was pregnant with you. Even to a child these explanations are inadequate.
I would reverse the order of the well meaning but wavering trial judge.
GUNTHER and FARMER, JJ., concur.
NOTES
[1] See generally DuRocher, Robin, Balancing Competing Interests in Post-Placement Adoption Custody Disputes, How Do the Scales of Justice Weigh the Rights of Biological Parents, Adoptive Parents, and Children?, 15 J.Legal Med. 305 (June 1994).
[2] The history of constitutional protection of parental rights can be traced beginning with Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), through Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), Smith v. Organization of Foster Families, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 and Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), to Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989).
[3] The supreme court did not set forth all of the facts in its opinion in Doe, but referred to the facts set forth in In Re The Adoption of John Doe, 524 So.2d 1037 (Fla. 5th DCA 1988).
[4] § 63.032(14), Fla. Stat. (1993) ("`Abandoned' means [that a father], while being able, makes no provision for the child's support and makes no effort to communicate with the child, which * * * is sufficient to evince a willful rejection of parental obligations. If, in the opinion of the court, the efforts of [the father] to support and communicate with the child are only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. In making this decision, the court may consider the conduct of a father towards the child's mother during her pregnancy.") [e.s.]
[5] The leading dictionaries generally define support as used in this sense as: (1) "maintenance, as of a family, with the necessities of life," American Heritage Dictionary of the English Language 1804 (3d ed.); (2) "that which supports life; supply of necessaries; means of livelihood or subsistence; formerly sometimes simply food, provisions," Oxford English Dictionary 1968 (compact 2d ed.). To be sure, the OED also includes an additional meaning or sense as "[s]piritual help; also subjectively, mental comfort." It is clear from the OED text, however, that this is at best a weak, or tertiary, sense. Indeed, the AHD does not even bother to include that tertiary sense.
[6] I disagree with any attempt to denigrate the parental right of an unmarried father, just as I would not agree with any attempt to minimize the parental right of an unmarried mother. As Judge Stevenson has shown in his thoughtful dissenting opinion today, the ties between birth parents and their children are mystically strong. While the father's role in procreation and birth may be limited by nature to fertilizing the egg, it is still an indispensable contribution. The fact that the mother may have the exclusive right to say what will happen with the fetus in no way supports the conclusion that she has the exclusive right to say what will happen with the child.
[7] In appellee's motion for rehearing there is a contention that the father was given notice of the hearing on the prebirth petition for adoption and simply failed to attend it. They newly include a notice of hearing that was filed in the trial court just four days before the scheduled hearing on the petition. This notice was not in the record submitted to us, but I accept appellees' contention that it was part of the court file.

The notice does not contain a certificate of service. Nor does it state whether, or how, it purportedly was served on the birth father. Nor does the record contain any specific evidence that it was actually served or that appellant ever received it. Moreover, the document was filed 6 August 1992, a Thursday, and purported to give notice of a hearing to be held on the following Monday. That amounts to giving a birth father no more than two working days notice to prepare for a hearing in which his right to object to the adoption of his child will be determined.
Quite apart from its obvious failure to qualify as service of process, I would have little trouble in finding such notice insufficient and unreasonable. See Fla.R.Civ.P. 1.090(d) ("A copy of any written motion which may not be heard ex parte and a copy of the notice of the hearing thereof shall be served a reasonable time before the time specified for the hearing."); State Dep't of Transp. v. Plunske, 267 So.2d 337 (Fla. 4th DCA 1972) (five days notice of hearing generally required, less may be allowed if actual notice is received and there is time to prepare); Matter of Adoption of Baby Doe, 572 So.2d 986 (Fla. 1st DCA 1990) (two days notice to birth father of hearing on adoption insufficient); Johnson v. Henck, 482 So.2d 588 (Fla. 1st DCA 1986) (two days notice of hearing in custody matter insufficient). In this case, there is positive evidence that the father never received this particular notice.
[8] The Illinois Supreme Court reached a decision in its "Baby Richard" case that is indistinguishable from the original panel majority decision in this case, and now the United States Supreme Court has refused to disturb the Illinois decision. Petition of Doe, 159 Ill.2d 347, 638 N.E.2d 181, 202 Ill.Dec. 535 (Ill. June 16, 1994), cert. denied sub nom. Baby "Richard", a/k/a Baby Boy Janikova v. Kirchner (Otakar), ___ U.S. ___, 115 S.Ct. 499, 130 L.Ed.2d 408 (1994), and Doe v. Kirchner (Otakar), ___ U.S. ___, 115 S.Ct. 499, 130 L.Ed.2d 408 (1994).
[9] I do join Judge Pariente's comments about the intermediary. This record suggests strongly that much of what has happened procedurally in this case could have been avoided if she had been more forthcoming in dealing with the court and her clients.
[1] The constitution requires that parental rights be terminated, if at all, on at least clear and convincing evidence. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
[2] Actually, Linda was already the mother of three minor children when she became pregnant with Gary's child. Her two older children resided with their father, while Linda had custody of the youngest.
[3] See § 409.903(5), Fla. Stat. (1991) (after Jan. 1, 1992, where pregnant woman lives in family unit with income at or below 185% of most current federal poverty level, woman is eligible for Medicaid benefits during entire pregnancy and post partum period). The applicable federal poverty level when Linda became pregnant was fixed at not less than $2066 in monthly income. Accepting the trial court's resolution of the evidence to result in a finding that Gary earned the highest amount testified ($400 weekly, rather than $300), Linda and Gary had a combined monthly income of far less than $2066.
[4a] We note that Linda's expenses after leaving the house she shared with Gary were significantly greater than the amount she was able to contribute to the household expenses when she and Gary lived together. It is impossible from the evidence to find that he had the ability to maintain separate households for both of them apart.
[5a] It is difficult to fathom the purpose for this filing, other than to suggest that the father was avoiding service. If so, the fact that the post office had not yet given final notice of certified mail to the addressee should have suggested to the intermediary that it was then improper to seek an order waiving the addressee's consent.
[6a] See R.Reg.Fla.Bar 4-3.3(d) ("In an ex parte proceeding a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse."). The burden of candor on an attorney acting as an adoption intermediary is especially acute; for the consequences of a lack of candor may, as here, redound to the detriment of the newborn child to be adopted.
[7a] See R.Reg.Fla.Bar 4-1.4 (lawyer shall keep client informed about status of matter).
[8a] We can find no basis in this case for the appointment of an attorney ad litem for E.A.W. Under section 63.052(1), Florida Statutes (1993), upon the entry of the placement order petitioners became her legal guardians. Section 63.062(1)(c), Florida Statutes (1993), expressly provides that only a child older than 12 years of age has standing to object to the adoption. In this case, E.A.W. did not have standing to object to the adoption and thus had no cognizable interest to assert on the abandonment issue.
[9a] In his final order on rehearing, the trial judge expressly stated that, because he was now finding that the father had abandoned the mother during pregnancy:

"it is unnecessary * * * to delve into the question of the best interests of the child and, therefore, the Court finds that the various objections which were raised to the introduction of certain exhibits and/or testimony would become moot."
We are thus required to accept his statement that the judge did not base his abandonment decision, for example, on testimony from another woman that the father had attempted a sexual battery on her, or that he had had consensual sex with her during Linda's pregnancy. We assume, without deciding, that such evidence might be relevant to the best interests of the child in resolving a custody dispute between Linda and Gary, as the dissent suggests. We do not agree, however, that it was relevant to the abandonment issue. Nor do we think that it must be considered at all in judging the legal sufficiency of the trial judge's abandonment decision, because of his declaration that he did not rely on it in deciding the rehearing.
To be sure, as a review of the rehearing transcript shows, this irrelevant evidence about Gary's criminal conviction, his 1985 acquittal and the woman's testimony became such a feature of the rehearing that we have serious doubts that this evidence did not have at least a subconscious effect on this judge  who, after all, had previously decided the same issue strongly in favor of Gary on virtually the same admissible evidence. It is most difficult, therefore, escaping the belief that it did effectually "poison the well." If we were not reversing his decision on legal sufficiency grounds, we would surely reverse and remand for a new trial on the abandonment issue before a different judge.
[10] One week later the court entered a final order of adoption.
[11] By an order entered November 10, 1993, we expedited this case and advanced the briefing schedule. We then expedited oral argument which was held on February 14, 1994. Our consideration, research and writing after oral argument has been, both collectively and individually, substantial and time consuming. Several drafts of opinions have been exchanged, reconsidered, revised and entirely rewritten. Thus, while it may not appear when this opinion is finally released that the case has been very much "expedited," all of the judges on the panel have spent a considerable part of their time since oral argument on this one case.
[12] See In the Matter of the Adoption of Doe, 524 So.2d 1037, 1041 (Fla. 5th DCA 1988).
[13] The 1992 change added the above entire paragraph to chapter 63, but the first two sentences had long been part of section 39.01(1), as indeed the court in Doe itself observed. 543 So.2d at 745. The definition of abandonment relates to sections 63.062 and 63.072, Florida Statutes (1993). The former requires the consent of a father, and the latter provides that the consent of a parent may be excused if the court finds that the parent has abandoned the child.
[14] In this case, Linda testified that she received AFDC benefits. Her entitlement to those benefits arose from the fact that she had her 2-year old child living with her and Gary. She was using her AFDC income, as intended, to provide the necessaries for her living child. Under the agreement between Linda and Gary, they divided rent and utilities equally, as to which Linda paid her share from her AFDC proceeds. Would she have been better off to have lived by herself in a cheaper apartment and thus paid the full rent and utilities directly to the landlord out of the same AFDC income? It is impossible from this arrangement to accuse Gary of living off of her AFDC income. The fact that the law imposes an obligation on a father to support a mother during pregnancy does not relieve the mother herself from a corresponding obligation to provide some of her own support, when she is able to do so. There is nothing in either the statutory definition of abandonment or in Doe that suggests otherwise.
[15] We note that some cases have held that the mere failure of a natural parent to support the child does not, in and of itself, provide a sufficient basis for allowing an adoption of the child over the parent's objection. See Smith v. Fernandez, 520 So.2d 654 (Fla. 3d DCA 1988), citing Hinkle v. Lindsey, 424 So.2d 983 (Fla. 5th DCA 1983). Some cases have squarely held that the failure to support the child for a period of over 2 years is insufficient to justify termination of parental rights. Smith, 520 So.2d at 654; In re Gossett, 277 So.2d 832 (Fla. 1st DCA 1973). By that measure, surely the lapse of 3 months, the longest period of nonsupport that the facts in this case will bear, is thus palpably insufficient.
[16] We do not suggest that emotional support is not immensely desirable, or that civilized man has no moral obligation to offer emotional support to the woman bearing his child. Rather, we hold only that the legislature has not unmistakably said in a clear statutory text that the failure to give emotional support constitutes abandonment of the mother.
[17] Even if emotional indifference or abuse were relevant prebirth conduct evincing an abandonment of the child, the basis for the relevancy is indisputably the effect such conduct has on the child, rather than the mother alone. Doe plainly shows that the rationale for considering the conduct of the father toward the mother during pregnancy was tied to how it affected the future welfare of the child. As the court did in Doe, it is appropriate to refer to the comparable provisions in chapter 39 as regards the waiver of parental rights to newborn children. There is a logical relationship between both abandonment and abuse in termination of parental rights proceedings under chapter 39 and waiver of parental rights proceedings under chapter 63. As to both proceedings, the underlying focus of the applicable statutory provision is conduct that already has, or is likely to have, an adverse effect on the child involved. Compare §§ 39.01(1) and (2), with § 63.032(14). Section 39.01(2) defines "abuse" as intentional acts "that result in any physical, mental, or sexual injury that causes or is likely to cause the child's physical, mental, or emotional health to be significantly impaired." There is absolutely no evidence in this record showing any impairment to baby E.A.W.'s health. Our research has failed to unearth a single case in which parental rights were terminated because one parent abused the other parent, as opposed to the child. The essential relevance of conduct by the father toward the mother during her pregnancy lies in how it has affected the well-being of the child during pregnancy and whether such conduct demonstrates indifference towards the child, rather than the mother.
[18] See Art. I, § 21, Fla. Const.; and 42 U.S.C. §§ 2996-2996k. State revenues also fund county legal aid programs to provide legal services to the indigent in civil cases. See §§ 28.241 and 34.041, Fla. Stat. (1993).